[No. 27624-7-I.    Division One.    June 1, 1993.]

ROBERT L. GILLESPIE, ET AL, *Respondents,* v. SEATTLE-FIRST NATIONAL BANK, *Appellant.*

152

*Michael E. Kipling* and *Graham & Dunn,* for appellant.

*Michael Todd Davis* and *Law Offices of Douglas W. Scott,* for respondents.

KENNEDY, J. — Appellant Seattle-First National Bank (hereinafter referred to as the Bank) appeals the trial court's award of $945,706 in damages and $75,000 in attorney fees to the respondents. The respondents, all of whom are members of the family of Robert Gillespie, deceased, cross-appeal, seeking additional damages. We affirm as to the appeal, grant an additional $175,617 for operating losses on the cross appeal, and award the Gillespie trust beneficiaries attorney fees for defending the appeal and for a portion of the cross appeal.

## FACTS

This case is based on a claim for professional negligence brought by various members of the Gillespie family against the Bank for mismanagement of a trust estate. The fiduciary relationship between the parties began in 1959 with the creation of the Robert Gillespie Testamentary Trust.[1] The trust was funded with a one-half interest in three parcels of commercial property located south of the Seattle Kingdome.[2]

---

[1] The trustor's wife, Muriel, was cotrustee and a 50 percent income beneficiary of the trust. The other income beneficiaries were plaintiffs Robert L. Gillespie, David G. Krows and Patricia A. Ancich, the trustor's grandchildren. These grandchildren were also the remainder beneficiaries under the trust.

[2] Respondent Ralph W. Krows (the trustor's son-in-law) and William and Eunice Gillespie (the trustor's children) inherited the remaining one-half interest in the properties. The Bank also served as the property manager for these people pursuant to an agency agreement executed in January 1970.

William's one-sixth interest later passed to Peoples Bank in trust for Eunice. Prior to commencement of this litigation, Eunice assigned her claims to her children, the respondents Robert L. Gillespie and Patricia A. Ancich.

From 1959 to 1983 the family held onto all three properties and approved Bank recommendations involving leases and repair. Although Muriel was a cotrustee, it is undisputed that none of the family had any experience or expertise in commercial real estate and that the Bank, which held itself out as having expertise in that field, took the lead in all management decisions relating to the properties under its care. The family relied upon the Bank's superior knowledge and expertise.

In late 1983, the sole tenant of the major trust asset, a building located at 2700 4th Avenue South, informed the Bank that it wanted to buy the property where it was located or move out at the end of its lease. The property at 2700 4th Avenue South was then worth $1,250,000 and unencumbered.

The Gillespies informed the Bank that they were interested in a low risk industrial real estate rental investment. The Bank recommended a leveraged exchange option whereby the family would exchange the property located at 2700 4th Avenue South for property of higher value and finance the difference. The family agreed to follow the Bank's recommendation and, in March 1984, the Bank began looking for property to complete the exchange.

On May 8, 1985, the Bank introduced the family to Willow Bank Business Center (hereinafter referred to as WBBC), recommending its acquisition as "an excellent prospect in all regards." WBBC, which is located in Redmond, consists of three single-story buildings totaling 52,000 square feet and divisible into 33 separate bays. WBBC was then 97 percent occupied, with one tenant, Charlton, occupying 51 percent, or 17 bays. The Bank projected that WBBC would generate a first year taxable income of $63,000.[3]

Based on the Bank's recommendation and the information the Bank supplied, the family approved acquisition of WBBC for $2,180,000, with a $908,000 down payment and a $1,300,000 loan. The $908,000 represented all of the net

---

[3]The Bank failed to tell the family that WBBC had operated at a substantial loss in 1984.

proceeds of the exchange of the property located at 2700 4th Avenue South. The $1,300,000 loan required debt service of $12,784 per month.[4]

The Bank learned that Charlton was for sale prior to buying WBBC, but did not inform the family. In November 1985, 2 months after the Gillespies acquired WBBC, Charlton was bought by an out-of-state company. In January 1986, Charlton's new owner exercised its option to vacate on 60 days' notice. Charlton moved out in March 1986. The Bank met with the Gillespies on May 6, 1986. At this time the Bank informed the family that some expenditures for improvements and re-leasing would be needed, but that Charlton's vacating of the property was only a "temporary setback" and no cause for concern.[5]

Muriel Gillespie died on May 18, 1986. The Bank finished winding up the trust affairs and transferred the trust assets to the remainder beneficiaries in April 1987. Having no direct experience with the management of commercial real estate, the remainder beneficiaries signed a management agreement with the Bank to have the Bank continue management of WBBC. The Bank continued to manage WBBC without interruption.

The Bank and family met again on September 19, 1986. At this time the Bank informed the family that several WBBC tenants had accumulated substantial rental arrearages and recommended that the family take out a loan of $75,000 to cover an overdraft on the WBBC account. Upon the Bank's advice, the family took out a 30-month loan for $75,000 on February 13, 1987.[6]

---

[4]The trust purchased 60 percent of WBBC and Ralph and Eunice purchased 20 percent each. Peoples Bank, which held Eunice's aforementioned one-sixth interest in the properties located in Seattle, elected not to participate in the leveraged exchange. Accordingly, that one-sixth share of the property located at 2700 4th Avenue South was sold outright.

[5]Although the re-leasing of Charlton's space went slower than the Bank expected, the vacancy was essentially filled by February of 1987.

[6]The debt service on this loan was $2,826 per month. Thus, the family's total monthly outlay for debt service on WBBC was increased to $15,700 per month.

Still, the rental arrearages continued to increase. At the parties' next meeting, on September 2, 1987, the Bank informed the Gillespies that WBBC had lost another $72,000. Prior to this meeting the family thought that the WBBC situation was improving as the Bank had increased its account income payments in June 1987 and July 1987. The family now believes that the Bank used the increases in rental income from the two original trust properties to mask WBBC's continued losses.[7]

In January 1988 (after advising the Bank of its intention to do so approximately a month earlier), the family ended its relationship with the Bank and hired a new property manager, Scott Real Estate. Scott began aggressively evicting nonpaying tenants and WBBC continued to lose money. In March 1988, after learning from Scott Real Estate that WBBC required extensive tenant improvements in order to become profitable (an expense the family did not feel it could afford), the Gillespies listed WBBC for sale for $2 million. They were unable to sell WBBC until April 1989, and then for only $1,550,000.

In April 1989, the family consulted with an attorney specializing in commercial real estate. On August 10, 1989, the Gillespies filed suit to recover their losses. Following a bench trial, the trial court found that the Bank had erroneously recommended a leveraged exchange and that it negligently selected WBBC, which was an unsuitable investment for the Gillespies due to its excessive risk. In addition, the court found that the Bank failed to properly disclose pertinent information about WBBC, and negligently managed WBBC through December 1987.[8] The court also found that the family lost its entire cash investment in WBBC and incurred oper-

[7]The trial court made no finding that the Bank intended to "mask" WBBC's continued losses. It is not disputed, however, that, because of the way the Bank's financial reports to the family were written, the family was not fully informed of the magnitude of WBBC's financial difficulties. Finding of fact 45 (unchallenged).

[8]The Bank does not challenge the trial court's finding that it negligently managed WBBC through December 1987.

ating losses on WBBC of $175,617. These operating losses were covered by income the family would have received from its other unencumbered buildings and by loans and out-of-pocket contributions by various family members.

In attempting to make the family whole, the trial court awarded damages as if the Gillespies had sold, rather than exchanged, the property at 2700 4th Avenue South, paid all capital gains taxes and reinvested the net proceeds in a conservative, nonleveraged real estate investment. The court found that the damages totaled $945,706, which included $777,302 as the amount the family would have had available to reinvest, plus 4 percent annual appreciation from October 1984 to October 1990. The trial court also awarded the trust beneficiaries $75,000 in attorney fees but made no award for the operating expenses lost on WBBC or for the lost rental income the family requested. This appeal and cross appeal followed.

## ANALYSIS

### A. Statute of Limitations/Discovery Rule

The trial court concluded that RCW 4.16.080[9] applies to the family's claims arising under the agency agreement (40 percent of WBBC) and that RCW 11.96.060[10] applies to the family's claims arising under the Robert Gillespie Testamentary Trust (60 percent of WBBC). The court further concluded that the agency agreement between the Bank and Eunice Gillespie and Ralph Krows amounted to a de facto trust and that the Bank's fiduciary duty to all members of

---

[9]RCW 4.16.080 provides that

"[t]he following actions shall be commenced within three years:

". . . .

"(2) . . . for any other injury to the . . . rights of another not hereinafter enumerated".

[10]RCW 11.96.060 provides in relevant part that

"(1) [a]ny action against the trustee of an express trust, . . . whenever executed, for any breach of fiduciary duty, must be brought within three years from *the earlier of* (a) the time the alleged breach was discovered or reasonably should have been discovered, . . . or (c) *the time of termination of the trust* . . . .." (Italics ours.) Enacted by Laws of 1984, ch. 149, § 47, effective January 1, 1985.

the family, whether arising under the agency agreement, the testamentary trust or the management agreement which commenced following the distribution of the trust assets, was essentially the same. These conclusions are not challenged.

The trial court also concluded that the family's claims first arose when the Bank closed the purchase of WBBC on September 26, 1985. Neither side contests this conclusion. However, the Bank challenges the following conclusions of law: conclusions 9, 11 and 12 in which the trial court ruled that the statute of limitation governing the agency and post-trust management agreements (RCW 4.16.080) was tolled until late November/December 1987, when the family notified the Bank that the theretofore continuous fiduciary relationship would be ending; and conclusion 13 in which the trial court ruled that the "time of termination of the trust", as those words are used in RCW 11.96.060(1), refers to April 1987, when the Bank finished its winding down of the trust, produced its final trust accounting and transferred title to the trust assets to the remainder beneficiaries.[11] The Bank also challenges conclusion 14, which states that "[p]laintiffs' claims against the Bank are not barred by . . . RCW 4.16.080 and RCW 11.96.060."

The trial court entered no conclusions of law relating to the application of the discovery rule and, in fact, the trial court specifically rejected the family's proposed conclusion of law that the discovery rule tolled the commencement of the limitation period. Instead, the trial court *may* simply have adhered to the common law rule that any and all statutes of limitation which might otherwise apply are tolled until termination of the fiduciary relationships here at issue. *See* 54 C.J.S. *Limitations of Actions* § 184, at 239 (1987) (it is the

---

[11]The Bank argues that, instead, the trust terminated, by its own terms, on May 18, 1986, when Muriel died. The trust instrument provides that "upon the death of my wife, MURIEL E. GILLESPIE, the Trust shall terminate . . .."

general rule that, in the case of a direct, express and continuing trust, the statute of limitation does not run between the trustee and beneficiary as long as the trust subsists). *Accord, A.L. Hotchkin v. McNaught-Collins Imp. Co.*, 102 Wash. 161, 167, 172 P. 864 (1918); *Meck v. Behrens*, 141 Wash. 676, 681, 252 P. 91, 50 A.L.R. 207 (1927); *Arneman v. Arneman*, 43 Wn.2d 787, 797, 264 P.2d 256, 45 A.L.R.2d 370 (1953); *Department of Rev. v. Puget Sound Power & Light Co.*, 103 Wn.2d 501, 509, 694 P.2d 7 (1985) (this latter case holding that "[i]n the case of an express trust, the limitations period does not begin to run 'so long as the trust subsists'" (quoting *Arneman*, 43 Wn.2d at 797)). *Cf. Quinn v. Connelly*, 63 Wn. App. 733, 741, 821 P.2d 1256 (for attorney malpractice claim limitation period began to run no later than the termination of the attorney-client relationship), *review denied*, 118 Wn.2d 1028 (1992); *Samuelson v. Freeman*, 75 Wn.2d 894, 900, 454 P.2d 406 (1969) (in medical malpractice case, limitation period is tolled until treatment for particular illness or condition has terminated); *Hermann v. Merrill Lynch*, 17 Wn. App. 626, 630, 564 P.2d 817 (1977) (whether the evidence supports plaintiff's claim that the fiduciary relationship was a continuing one, so that the statute of limitation is tolled until the relationship is terminated, is a question for the trier of fact).[12]

Although the trial court entered no conclusions of law determining the applicability of the discovery rule, finding of fact 44 states:

> At least until notice of the termination of the Gillespie family's fiduciary relationship with the Bank in late November of 1987, the Gillespie family members neither knew nor should they reasonably have known that a) the Bank had failed to disclose to them before acquisition [of WBBC] material information concerning the WBBC, b) the Bank had failed to prop-

---

[12]This general common law rule is subject to the defense of laches, that is, undue and unexplained delay following notice which works an injustice upon the trustee. *See* 90 C.J.S. *Trusts* § 455, at 881 (1955).

erly analyze the WBBC as an investment, and c) the Bank had directed them to a leveraged exchange by use of erroneously calculated investment options.[13]

The Bank argues that the trial court erred in determining that the plaintiffs' claims were not time barred, in two respects. The Bank argues (1) that as to all plaintiffs, the trial court's conclusion that the 3-year period of limitation accruing on September 26, 1985, was tolled "merely because of a continuing fiduciary relationship" is a clear error of law; and (2) that, as to the beneficiaries of the testamentary trust, the trust "terminated" as a matter of law when Muriel died on May 18, 1986. The family did not file its lawsuit until August 10, 1989, nearly 4 years after the Bank purchased WBBC. The Bank argues that, if the discovery rule applies at all, the rule triggered the running of the 3-year period of limitation by no later than May 6, 1986, when the family met with the Bank to discuss the impact of Charlton having vacated the premises. By then, the Bank argues, if not sooner, the family must have realized its rental income from WBBC would be far less than its debt service on the property. Thus, the Bank concludes, the family knew, by then, that it had been "injured" and was placed upon inquiry notice to discover its cause of action. We will discuss these contentions in turn.

1. *Was the period of limitation tolled merely because of the existence of a continuing fiduciary relationship, arising from one type of agreement or another, until December 1987?*
  ■ Although the trial court's oral opinion and the formal findings of fact and conclusions of law are somewhat ambiguous, to the extent that the trial court *may* have believed that the "mere existence" of a continuing fiduciary relationship tolled the running of the period of limitation, we agree with the Bank that this was error. This clearly was once the common law of the State of Washington, with regard to

---

[13]The Bank argues that finding 44 is really a conclusion of law, reviewable de novo by this court. In the alternative, the Bank argues that, if this is properly to be treated as a finding of fact, it must fail for lack of support in the record. We will discuss the Bank's challenges in due course.

express trusts. See cases cited for this proposition, *supra.* However, our State Legislature changed the state law, effective January 1, 1985, with the adoption of RCW 11.96-.060(1), with respect to "express" trusts as defined therein.[14] Clearly, the Robert Gillespie Testamentary Trust is covered by the provisions of RCW 11.96.060(1). The trial court recognized that this was so, and we so hold.

██ Just as clearly, RCW 11.96.060(1) provides that an action against the trustee of any express trust for any breach of fiduciary duty must be brought within 3 years from *the earlier of* the time the alleged breach was discovered or reasonably should have been discovered or the termination of the trust. Thus, it can no longer be said that, in Washington, the "mere existence" of a continuing express trust tolls the running of the statute of limitation. That running may be triggered earlier than the termination of the trust *if* the beneficiary knew or reasonably should have known of the breach of fiduciary duty, and we so hold.[15]

Although the trial court held (and neither party disputes) that the agency agreement was governed by a different statute, RCW 4.16.080, it also is not disputed that the agency agreement gave rise to a "de facto" trust having the same general purpose as the testamentary trust and giving rise to

---

[14]RCW 11.96.060(1) excludes from its coverage any trust not defined as an "express" trust under RCW 11.98.009. RCW 11.98.009 excludes from the definition of "express" trusts all resulting trusts and constructive trusts, together with a lengthy list of other types of trusts not here relevant. RCW 11.96.060(1) applies to all other "express" trusts, whenever executed, implying, perhaps, that only such trusts as are expressed in an executed, written document are meant to be covered. However, at common law, an express trust is one created or declared in express terms, usually (but not necessarily always) in writing. *See* Black's Law Dictionary 1354 (5th ed. 1979).

[15]Although the Bank argues otherwise, we do not believe that the trial court misunderstood the application of RCW 11.96.060(1). Finding of fact 44, when read in the context of the conclusions of law, appears to reflect the trial court's understanding that the running of the statute *may* be triggered earlier than the termination of the trust. The court simply found that, here, no such triggering occurred. Thus, the court concluded that the statute was tolled until the termination of the trust.

the same type of fiduciary obligation as the testamentary trust.[16]

■ Accordingly, we see no reason, in this case, to distinguish the two types of beneficial interests for purposes of the application of the discovery rule. We hold that, for the purposes of this particular case, any actual or constructive knowledge which would have triggered the running of the statute of limitation as to the testamentary trust would also have triggered it as to the "de facto trust" agency agreement. There is no dispute that each class of beneficiary was privy to the same information at or about the same time, and there is no dispute that all of the family members relied equally upon the Bank's superior knowledge and expertise. Moreover, all of the family members were equally untrained and inexperienced with commercial real estate and complex financial transactions.[17]

2. *When did the testamentary trust "terminate"?*

The words "the time of termination of the trust" as used in RCW 11.96.060(1) are not defined anywhere in RCW Title 11. These statutory words, which became effective on January 1, 1985, have not heretofore been construed in the appellate courts of Washington. Relying upon the statement in the Robert Gillespie Testamentary Trust that the trust "shall terminate" upon the death of Muriel, and upon *Taplett v. Khela*, 60 Wn. App. 751, 807 P.2d 885 (1991) (a partnership dissolu-

---

[16]In unchallenged finding of fact 5, the trial court found that the agency agreement was executed "for the purpose of correlating the Bank's management" of the half interest in the three buildings south of the Kingdome owned by Ralph Krows and Eunice Gillespie with the half interest owned by the testamentary trust. In unchallenged finding of fact 6 the trial court found that the Bank managed all of the family's respective interests in a mutual, reciprocal manner. In unchallenged conclusion of law 1, the trial court concluded that the agency agreement amounted to a de facto trust.

[17]The trial court so noted in unchallenged findings of fact 4, 7, 25 and 43. In unchallenged conclusions of law 2, 3, 4 and 6 the trial court held that the Bank owed the same duty of care to both classes of beneficiaries. Although we certainly make no general pronouncement of law with regard to fiduciary relationships other than those clearly governed by RCW 11.96.060(1), it would be a peculiar result, indeed, to apply any different rule to the two classes of beneficiaries here extant, in light of these undisputed findings of fact and conclusions of law.

tion decision published after the trial in this case), the Bank argues that the statute of limitation contained in RCW 11.96-.060(1) commenced to run no later than May 18, 1986, the date of Muriel's death. Because this lawsuit was not filed within 3 years of that date, the Bank argues that the family's claim is time barred, at least as to the 60 percent interest in WBBC governed by the testamentary trust. Accordingly, we are asked by the Bank to reverse the trial court's holding that the trust did not "terminate" for purposes of RCW 11.96-.060(1) until the winding down was completed, the final accounting was rendered and the trust assets were distributed in April 1987.

In *Taplett,* one partner sought an accounting of the partnership affairs more than 6 years after the real estate which was the partnership's main asset was lost to forfeiture and the partners divided up their remaining cash and went their separate ways. No formal winding up of the partnership affairs had ever occurred. RCW 25.04.430 provides that a partner's right to an accounting of his interest accrues "at the date of dissolution" of the partnership. Unlike the trust situation with which we deal here, the "dissolution" of a partnership is defined by statute.

> The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from winding up of the business.

RCW 25.04.290. In *Taplett,* this court held that the claim for an accounting was time barred (under RCW 4.16.040) because the partnership statute clearly and unambiguously set the accrual of an action for a partnership accounting at the date of "dissolution" rather than at the completion of the winding up. *Taplett,* 60 Wn. App. at 754-55.

Although a partnership "dissolution" is defined in the partnership statute and "the time of termination of the trust" is not defined in RCW Title 11, the Bank argues that a partnership "dissolution" is synonymous with a trust "termination". The Bank cites no authority for this proposition. We disagree that *Taplett* applies, by analogy or otherwise.

At common law, "the statute [of limitation] does not [commence to] run until [there has been] a final accounting by the trustee". 76 Am. Jur. 2d *Trusts* § 440, at 419 (1992). Where the trustee has never rendered a final accounting the statute does not begin to run, although laches, after a period of many years, may be available to the trustee as a defense. 76 Am. Jur. 2d *Trusts*, *supra* at 419. Even where a trust has been fully terminated by its own terms or by a settlement with the beneficiary or by some other act of the trustee' intended and understood by both parties to constitute a discharge of the trust, the statute of limitation may not commence to run in the trustee's favor until the relation between the parties has been "so completely severed as to indicate that the beneficiary is no longer controlled by the trustee's influence which prevailed during the existence of the trust." 54 C.J.S. *Limitations of Actions* § 189, at 246 & n.61 (1987) (citing *McDermott v. McAdams*, 268 Ark. 1031, 1037-38, 598 S.W.2d 427, 430-31 (1980) (although trust ended by its express terms on December 31, 1973, statute of limitation did not commence to run because remainder beneficiary (the late Senator John L. McClellan) consented to appellant, his daughter and trustee, continuing to hold the trust assets under a new (resulting) trust or as a bailee or in some other representative capacity)).

Washington case law predating the enactment of RCW 11.96.060(1) appears to be in accord. *See, e.g.*, *Hotchkin*, 102 Wash. at 167 (citing the same general rule as now found at 54 C.J.S. *Limitations of Actions* § 139, at 184 (1987) — the statute of limitation will not begin to run in favor of the trustee of a direct, express and continuing trust until the trust terminates; and section 189 — trusts are not within the statute of limitation until there has been a termination or repudiation, or where a trust is fully terminated by its terms or by settlement with the beneficiary or by an assertion by the trustee of an adverse claim made known to the trust beneficiary).

Accordingly, it is our task to ascertain whether our Legislature, when it enacted RCW 11.96.060(1), intended to retain the common law definition of "termination" of the trust for

purposes of the statute of limitation contained therein. We conclude that it did.

The legislative history of the Laws of 1984, ch. 149 (Engrossed Substitute House Bill 1213) includes the following:

> On motion of Senator Talmadge, the section by section analysis of Engrossed Substitute House Bill No. 1213 will be included in the Journal to assist in the interpretation of the bill. See Appendix A located immediately after the Sixtieth Day.

Senate Journal, 48th Legislature (1984), at 667. Appendix A is entitled *Comments on the 1984 Revision of the Washington Trust Act*, and commences at page 1645 of that same Senate Journal. The comment to RCW 11.96.060(1) is found at page 1725:

> (1) The general rule in Washington as stated in *Hotchkin v. Mc[N]aught-Collins Improvement Co.*, 102 Wash. 161, 172 Pac. 864 (1918) appears to be that the statute of limitations against the trustee of an express trust does not begin to run until the trust is repudiated by the trustee or terminated. There appears to be no exception if the beneficiary had knowledge of the alleged wrongdoing but made no effort to bring suit within a reasonable time from the alleged wrongdoing. There is further confusion as to which statute of limitation period applies upon the termination or repudiation of a trust. The possible statutes of limitations run between 3 and 10 years, depending on the type of wrongdoing alleged. It is believed that uniformity in this area is necessary and that the 3 year statute of limitation period is sufficiently long and should begin to run from the earlier of the termination or repudiation of the trust, or the time the alleged breach was or should have been discovered.

█ Finding no indication that the Legislature intended to define "time of termination of the trust" differently from the normal common law rule, we affirm the trial court's determination that

> []the word "termination" in RCW 11.96.060[(1)] refers to when the trustee winds up the trust affairs and distributes the trust assets to the remaindermen. The Robert Gillespie Testamentary Trust terminated under this statute in April of 1987, when the Bank closed the trust accounts and transferred title to the WBBC to [the remainder beneficiaries].

Conclusion of law 13.

Thus, unless the statute of limitation was sooner triggered by some actual or constructive notice to the trust

beneficiaries, their lawsuit is timely, in that it was brought in August 1989, well within 3 years from April 1987.[18]

3. *Was the running of the statute triggered any sooner than the "termination of the trust" as above defined?*

As embodied in RCW 11.96.060(1), the "discovery rule" could sooner have triggered the running of the 3-year statute of limitation, even though the testamentary trust did not "terminate" until April 1987. Therefore, we next address the Bank's contentions that (1) the discovery rule does not apply at all and (2) even if it does, the family was put on inquiry notice that it might have a cause of action by May 5, 1986, when the Bank informed the family that its trust income would be "temporarily" reduced due to Charlton's departure.

As should be clear by now, the discovery rule must be reckoned with here because it has been affirmatively incorporated into RCW 11.96.060(1). That statute tells us that the normal, common law rule that the statute of limitation does not commence to run during the duration of an express trust is still the law in Washington *unless* something sooner happens to put the trust beneficiaries on actual or constructive notice that their cause of action has accrued.

Our Supreme Court's most recent analysis of the discovery rule is contained in *In re Estates of Hibbard*, 118 Wn.2d 737, 826 P.2d 690 (1992). In *Hibbard*, after outlining the history and development of the discovery rule in Washington case law from the time of the rule's adoption in 1969, *Hibbard*, 118 Wn.2d at 744-49, our Supreme Court stated that,

> [a]lthough there has been increased application of the discovery rule by this court, we still follow the reasoning of *Ruth v. Dight* [75 Wn.2d 660, 453 P.2d 631 (1969), the case in which the rule was first adopted]. Application of the rule is limited to claims in which the plaintiffs could not have immediately known of their injuries due to professional malpractice, occupational

---

[18]The agency agreement which governed the interests of Ralph and Eunice was terminated in December 1987, together with the management agreement which was adopted to replace the testamentary trust. Because this lawsuit was brought within 3 years of both April 1987 and December 1987, we need not determine whether the execution of the management agreement tolled the running of the statute as to the testamentary trust.

diseases, self-reporting or concealment of information by the defendant. *Application of the rule is extended to claims in which plaintiffs could not immediately know of the cause of their injuries.*

(Italics ours.) *Hibbard*, 118 Wn.2d 749-50.

■ Thus, under *Hibbard*, if the Gillespies were aware they were incurring financial losses by May 1986, as argued by the Bank, but could not know, because of professional malpractice, self-reporting or concealment of information by the Bank, of the *cause* of their losses, they were not yet aware of all the essential elements of their claim, specifically, duty, *breach, causation* and damages. *Hibbard*, 118 Wn.2d at 749-50, 752.[19]

The trial court specifically found that this financially unsophisticated family relied upon the Bank's admitted expertise, without interruption, from 1959 through 1987 (unchallenged finding of fact 43); that the Bank recommended a tax-deferred leveraged exchange in order to produce for the family the greatest after-tax income (unchallenged finding of fact 9); that the Bank recommended WBBC as "an excellent prospect in all regards" (unchallenged finding of fact 15); that the Bank projected a first year, after-tax rental income for WBBC of $63,000 (unchallenged finding of fact 15); that the Bank knew the material and relevant fact that WBBC had experienced a $41,000 loss in 1984 but failed to disclose this to the family prior to acquiring WBBC (unchallenged finding of fact 29); that the Bank knew Charlton, the anchor tenant of WBBC, was for sale before the purchase was closed and that this was relevant and important information which the Bank failed to disclose to the family until after the lawsuit was commenced (unchallenged finding of fact 30); that the Bank knew or should have known that, if Charlton should vacate, substantial retenanting costs should be expected in addition to the lost income (unchallenged finding of fact 31); that the

---

[19]*See also Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 221, 543 P.2d 338 (1975), discussed in *Hibbard*, 118 Wn.2d at 746, extending application of discovery rule to cases in which justifiable reliance upon a fiduciary relationship causes a claimant to be unaware of the negligent act at the time it occurs.

WBBC required "extraordinary management skills" in order to meet the Bank's income projections as well as substantial cash or credit resources if Charlton should vacate (unchallenged finding of fact 37); that, if the Bank had disclosed this relevant information to the family, the family probably would not have opted to acquire WBBC, especially not in a leveraged exchange at the price of $908,000 (unchallenged finding of fact 40); that a leveraged exchange was not, in fact, the family's best option to obtain the greatest income after tax (unchallenged finding of fact 41); that the Bank did not properly manage WBBC and the family first became aware of the severity of the rental arrearages in September 1986 (not having learned of this sooner because of the way the Bank's statements were written) (unchallenged finding of fact 45). Moreover, in May 1986, when the Bank met with the family to discuss its plans to lease up Charlton's vacated space, the Bank described this vacancy of 51 percent of the total space as only a "temporary setback" (unchallenged finding of fact 20). Finally, when the family learned, in September 1987, that, in spite of the $75,000 loan it took out a few months earlier, WBBC had accumulated unpaid obligations of another $72,000 (unchallenged finding of fact 23), it decided to investigate whether a new and more aggressive property manager might be appropriate (unchallenged finding of fact 26). This led to the replacement of the Bank as property manager, effective January 1, 1988 (unchallenged finding of fact 27).

These unchallenged findings, standing alone, support the proposition that the family, although generally aware by May 1986 that it was losing money, did not know that this was not merely a "temporary setback" until September 1986, or even September 1987, when it became clear that something was seriously wrong. Even then, the family felt that a more aggressive rental manager might cure the situation.

The Bank does challenge several findings of fact: finding 32, in which the trial court found that the Bank knew or should have known that the actual prevailing vacancy rate for property in the area like the WBBC was 17.5 percent

(instead of 7 percent as projected by the Bank); finding 35 in which the trial court found that the Bank failed to properly analyze WBBC as an investment, by failing to recognize and account for the risk of monetary loss if Charlton should vacate its 51 percent of the available bays; finding 36 in which the trial court found that the Bank failed to advise the family, as a reasonably prudent fiduciary would have done, that it might be necessary to support WBBC with rental income from the other, unencumbered properties; finding 39, in which the court found that a proper analysis of WBBC would have told the Bank this was not a suitable investment for this family; finding 41 in which the trial court found that, if the Bank had properly calculated the after-tax income the family could expect, it probably would not have recommended a *leveraged* exchange and, finally, finding 44, in which the trial court found that the family neither knew nor should it reasonably have known that (a) the Bank had failed to disclose material and relevant information before WBBC was acquired; (b) the Bank failed to properly analyze WBBC as an investment; and (c) the Bank directed the family to a leveraged exchange by use of erroneously calculated investment options.

█ The Bank argues that there is a lack of support in the record for each of these challenged findings.[20] We disagree. Not only are these challenged findings, in several instances, virtually identical to the extensive list of *unchallenged* findings, but also, in those same instances the challenged findings consist of reasonable inferences which any rational trier of fact could draw, based on the same evidence which supports the unchallenged findings. Although the Bank did present controverting evidence with respect to the challenged findings, we find no lack of competent evidence in the record to support each of these challenged findings. It is not our task to reweigh the evidence regarding vacancy rates, to

---

[20]The Bank's challenges to the sufficiency of the evidence relate both to the discovery rule and to the trial court's finding of a breach of fiduciary duty. In the interests of judicial economy we have combined the discussion here, in that our ruling disposes of both issues.

provide one example, but merely to determine whether substantial evidence exists in the record to support the challenged findings. *See, e.g., Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978) (if substantial evidence exists to support a finding, the appellate court must accept the trial court's determination). We find that evidence in the record here.[21]

■ Nor do we agree that challenged finding of fact 44 is really a conclusion of law to be reviewed de novo by this court. Unless the evidence is undisputed or unless reasonable minds cannot differ, what a person knew or should have known at a given time is a question of fact. It cannot be said as a matter of law that the Gillespies, whose fiduciary relationship with the Bank by then had lasted almost 30 years, knew or should have known that the Bank had failed to disclose material facts merely because Charlton left and their rental income dropped as a result. This is particularly so when the family was being told by the Bank that this was only a "temporary setback".

Finally, the Bank points out that, when the family sought legal counsel in April 1989, that attorney was provided with all the same documents and financial reports the Bank had provided to the family from the time the Bank first located WBBC. After several months of review and analysis of these records, the attorney advised the family that it had a cause of action and the lawsuit was filed. The Bank points out that all of the information which caused the attorney to conclude

---

[21]We also reject the Bank's claim that it was entitled to rely *with acquittance* upon the advice of the real estate experts it retained to appraise and to assist with analyzing this investment. *See* RCW 11.98.070(27). Nor does *Allard v. Pacific Nat'l Bank*, 99 Wn.2d 394, 406, 663 P.2d 104 (1983) (*Allard* I) stand for the proposition that, by hiring real estate experts who opined that the asking price of WBBC was less than its full market value, standing alone, "is sufficient to satisfy the trustee's duty to its beneficiaries." Second Amended Brief of Appellant, at 47. That the Bank was able to purchase WBBC at a favorable price does not, ipso facto, mean that the purchase of WBBC by means of a leveraged exchange was "an excellent prospect in all regards" as represented by the Bank. This is even more true when it is not disputed that a leveraged exchange was not, in fact, the family's best option (unchallenged finding of fact 41).

that the family had a cause of action was contained in the family's own files, and had been for many years. This being so, the Bank asks us to rule as a matter of law that the family had constructive notice of all of the elements of its cause of action from the time of acquisition of WBBC.[22] This we decline to do. It is true that a given claimant may be in possession of enough facts to be placed upon inquiry notice that he or she may have a cause of action and, when this occurs, the claimant must exercise due diligence in discovering the claim. The cases cited by the Bank stand for this proposition. Due diligence in such cases may well require that the claimant seek legal advice and thereby discover the cause of action. This is not such a case, at least not as of May 1986, when the Gillespie family met with the Bank to discuss the "temporary setback" arising from Charlton's departure.

It would be illogical to require a trust beneficiary, or any other person who must necessarily rely upon the expertise of his or her own trustee or attorney or accountant or other professional adviser for complex financial, legal, accounting or other professional advice, to consult with a competing expert simply because he or she has been supplied with reams of complex written materials which, if fully analyzed by a competing expert, might reveal a cause of action for professional malpractice. Before any such obligation of due diligence can arise, something first must happen to cause the one who justifiably relies upon his or her own expert reasonably to suspect that malpractice may have occurred. That "something" must be "something more" than that which the professional adviser

---

[22]The Bank relies upon *Zaleck v. Everett Clinic*, 60 Wn. App. 107, 802 P.2d 826 (1991); *Allen v. State*, 118 Wn.2d 753, 826 P.2d 200 (1992); *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 733 P.2d 530 (1987); and *Gevaart v. Metco Constr., Inc.*, 111 Wn.2d 499, 760 P.2d 348 (1988). *See also Cohen v. McAllister*, 688 F. Supp. 1040 (W.D. Pa. 1988) (claim for securities fraud time barred where claimant *and his attorney* failed to timely read a contract and securities legal opinion in their possession; if claimant and attorney had read these documents they would have discovered that defendant had misrepresented the terms of the contract).

describes as a "temporary setback", at least for so long as a *reasonable* person in those same circumstances would *reasonably* conclude, based upon what he or she is being told by the expert adviser, that what is occurring is only a "temporary setback."[23]

The Gillespies' situation is akin to that found in *Kundahl v. Barnett*, 5 Wn. App. 227, 486 P.2d 1164, *review denied*, 80 Wn.2d 1001 (1971). There, in 1962, a professional surveyor agreed to survey and stake the boundary lines for several lots which the claimants owned on Mercer Island. Although the stakes which were set did not seem to correspond to the general pattern of other properties in the area, the landowners were aware of surveying problems in the area. Accordingly, they relied upon the expertise of the surveyor they hired. They then built a house on one of their lots. As it turned out, the house they built encroached on a neighbor's land, a fact which the claimants discovered only when they got sued by their neighbor, more than 3 years after their survey was completed. The claimants brought their surveyor into the lawsuit and the surveyor argued that the claim was time barred. In rejecting this notion, this court observed:

> In this case, it is illogical to charge the [landowners] with the obligation of retaining the services of another surveyor to prove out the stakes which [their retained surveyor had] placed. That would be the only way that [the claimants] could discover the error; unless, of course, the second surveyor was in error, calling for a third survey, and so on ad infinitum.

*Kundahl*, 5 Wn. App. at 231.

We find no reason in fact or in law to reject the trial court's finding 44 that nothing occurred during the time of the trust and agency relationships here at issue to cause the

---

[23]Compare *Zaleck*, 60 Wn. App. at 112 (a reasonable person would have begun to doubt, sooner than in 4½ years, his physician's assurances that the patient's numb thumb, existing from the time of a painful injection of cortisone when the physician said he may have hit a nerve, was only a "temporary" symptom). The Gillespies' situation is more akin to that of a client who retains an attorney to represent him or her in a complex lawsuit. An adverse ruling on a preliminary motion could hardly be said to give rise to an obligation of due diligence on the part of the client

family to seek, in the exercise of due diligence, the advice of a competing expert. Although the family began to suspect, by September of 1987, that it needed a more aggressive manager, it acted upon those suspicions and found a more aggressive manager. These events occurred and the lawsuit was brought in less than 3 years from the time of termination of the testamentary trust and well within 3 years of the termination of the ongoing "de facto trust" agency relationship. We hold that the lawsuit was timely brought and that substantial evidence supports the trial court's finding of breach of fiduciary duty.

## B. Damages

In an attempt to make the family whole, the trial court awarded the Gillespies $945,706, the equivalent of their investment in WBBC, and $75,000 in attorney fees.

Because claims for breach of trust are equitable, *Dexter Horton Bldg. Co. v. King Cy.*, 10 Wn.2d 186, 191, 116 P.2d 507 (1941); *Allard v. Pacific Nat'l Bank*, 99 Wn.2d 394, 396, 663 P.2d 104 (1983) (*Allard* I) the trial court may grant whatever relief it deems is warranted, *Hubbell v. Ward*, 40 Wn.2d 779, 787, 246 P.2d 468 (1952), and place the trust in the same position as if the Bank had never breached its fiduciary duties. *Allard v. First Interstate Bank of Wash., N.A.*, 112 Wn.2d 145, 152, 768 P.2d 998, 773 P.2d 420 (1989) (*Allard* II). *See also Baker Boyer Nat'l Bank v. Garver*, 43 Wn. App. 673, 686, 719 P.2d 583 (finding make-whole remedy appropriate where trustee mismanages an account by failing to diversify investments), *review denied*, 106 Wn.2d 1017 (1986). Thus, we find the trial court's "make whole" remedy an appropriate measure of damages in this case.

### 1. *Bank's Arguments.*

First, the Bank contends that the trial court erred in awarding $945,706 in damages, as the defendant is only

---

immediately to seek a second opinion from a competing attorney, to ascertain whether the first attorney may have committed legal malpractice.

liable for the damages proximately caused by its breach. The Bank is correct that the court must consider whether the connection between the defendant's acts and its ultimate result is "too remote or insubstantial to impose liability." *Hartley v. State,* 103 Wn.2d 768, 781, 698 P.2d 77 (1985). However, we find that most of the damages here are not too remote to be traced to the Bank's breach.

As discussed in detail above, but for the Bank's faulty analysis and recommendation, the Gillespies would not have acquired WBBC, which was an unsuitable investment. Moreover, the Bank negligently managed WBBC after acquiring it.

Next, the Bank asserts that it is not liable for the Gillespies' independent business decisions. Indeed, the trial court found that "[p]laintiffs did not meet their burden of proof in establishing that their consequential damages were proximately caused by Defendant's breach."[24]

In response, the Gillespies assert that any decisions made after terminating their relationship with the Bank were made in an attempt to mitigate their damages. After the Bank allowed WBBC tenants to accrue over $68,000 in rental arrearage, in an attempt to mitigate their damages, the Gillespies ended their relationship with the Bank and hired Scott Real Estate. Scott began evicting nonpaying tenants in an effort to make WBBC more profitable. Having no more money to invest in WBBC to make necessary improvements, the Gillespies decided to sell the property.

These business decisions were not unreasonable. The Gillespies were placed in a position to have to make such decisions by the Bank's breach. "*If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than another is chosen.*" *Hogland v. Klein,* 49 Wn.2d 216, 221, 298 P.2d 1099 (1956) (quoting C. McCormick, *Damages* § 35 (1935)).

---

[24]As used by the trial court, the words "consequential damages" appear to refer in large part to those damages which are the subject of the cross appeal. The trial court's approach to calculating damages was different from the approach argued by the Gillespies.

Relying on *Salter v. Heiser*, 39 Wn.2d 826, 239 P.2d 327 (1951), the Bank contends that, under the benefit of the bargain rule, damages are limited to the difference between the value of the property and the purchase price as of the date of purchase and consequential damages proximately caused by the breach. The Bank's reliance on *Salter* is misplaced.

In *Salter* a property owner persuaded the plaintiff lessee to lease a resort by misrepresenting the availability of a liquor license. The lessee chose not to rescind the lease, and operated the resort despite the misrepresentations. At trial, the plaintiff sued for all business losses and won. The appellate court reversed and remanded, finding that the plaintiff had failed to show that all the damages were caused by the lessor's misrepresentations. *Salter*, 39 Wn.2d at 831.

In contrast, in the present case the Gillespies had no option to rescind the acquisition of WBBC. Whether the Gillespies paid a reasonable price for WBBC is likewise irrelevant. WBBC was an unsuitable investment for the family. Therefore, the "benefit of the bargain" rule does not apply here. The Gillespies obtained no benefit from their bargain. Instead, they lost their entire investment in WBBC. A different measure of damages is appropriate.

Finally, the Bank contends that the trial court erred by compounding the damages by 4 percent per year because this is effectively an award of lost profits. The trial court found that "a conservative, adequately managed commercial real estate investment in the greater Seattle area would have yielded a four percent (4%) per annum compounded return." On this basis the court compounded the damage award at 4 percent per annum from October 31, 1984, through October 1990.

Where a trustee breaches his duty by purchase of property that he had a duty not to purchase, he is liable for the amount "expended in such purchase, with interest thereon . . . ." Restatement (Second) of Trusts § 210 (1959). Therefore, in the present case the court could properly include interest in the damage award. Compounding the award at 4

percent per year is the equivalent of awarding interest on the damages at a very conservative interest rate. On this basis the award may be affirmed as reasonable.

■ The Bank also contends that 4 percent appreciation per year is based on improper speculation. Lost appreciation may be recoverable where the plaintiff can show such damages "with reasonable certainty". *Iverson v. Marine Bancorporation*, 86 Wn.2d 562, 565, 546 P.2d 454 (1976); Restatement (Second) of Torts § 912, comment *d* (1979). Here, the trial court relied on the testimony of two experts, Mr. Safer and Mr. Sperling, in determining that 4 percent was an appropriate rate of appreciation. Based on these expert opinions, the court was able to establish lost appreciation with reasonable certainty.

## 2. *Gillespies' Cross Appeal.*

Based on the "make whole" theory of damages, the Gillespies request that their damage award be increased to include $443,058 in lost profits and $175,617 in operating losses. We deny the $443,058 for lost profits, but grant the request of $176,617 for operating losses.

■ We agree with the trial court that the lost profits are too speculative to award. Lost profits must be established "with reasonable certainty", *Iverson*, 86 Wn.2d at 565, by comparison to similar businesses in the same vicinity operating under substantially the same conditions. *Farm Crop Energy, Inc. v. Old Nat'l Bank*, 109 Wn.2d 923, 931, 750 P.2d 231 (1988). Here, although there is evidence that a reasonable investor would expect net rents measured by a 9.5 percent capitalization rate, the trial court did not abuse its discretion by declining to speculate as to whether such profits would have been earned by the hypothetical building that should have been purchased here. Certainly any conservative investor would *hope for* such profits. But there are too many unknown factors: new competition, recession, changing market conditions. We will not disturb the trial court's sound exercise of its discretion.

In contrast, the operating losses were established with reasonable certainty and are unchallenged in any event. These losses were covered by income the family would have received from its other unencumbered buildings which had to subsidize the losses of WBBC, and by some $147,000 in new loans and/or out-of-pocket contributions by various family members to keep WBBC afloat. These losses were proximately caused by the inappropriate investment in WBBC and by the Bank's improper management of WBBC after it was acquired. Therefore, award of these losses, totaling $175,617,[25] is necessary to make the family whole.

### C. Attorney Fees

The Bank asserts that the trial court erred in basing its attorney fee award to the trust beneficiaries on RCW 11.96-.140, absent some proof of bad faith or an attempt at self-enrichment.

Under RCW 11.96.140 "[e]ither the superior court or the court on appeal, may, in its discretion, order . . . attorneys fees, to be paid by any party . . . as justice may require." The statutory language does not require bad faith or self-dealing. Rather, fee awards are left to the discretion of the court. However, the Bank argues that *Allard* I, 99 Wn.2d at 408 (fees awarded based on trustee's "inexcusable conduct" and breach of fiduciary duty) and *Allard* II, 112 Wn.2d at 152 (fees appropriate to make plaintiff whole for trustee's "egregious" breach) stand for the proposition that attorney fees should not be shifted to a trustee who has breached its fiduciary duty absent a finding of bad faith or self-dealing.

In *Allard* II the Supreme Court affirmed an award of fees against a trustee which sold real property for less than

---

[25]In unchallenged finding of fact 46 the trial court calculated that WBBC generated a net operating loss to the family of $175,617. Although we would have calculated the net operating losses somewhat differently than did the trial court, in unchallenged finding 47 the court calculated substantial additional out-of-pocket losses for which the family was never compensated and it is undisputed that the family had to borrow or otherwise acquire $147,000 to cover WBBC overdrafts. The $175,617 figure is certainly within the range of the uncontroverted evidence.

its market value without first obtaining an appraisal. There was no finding of bad faith or self-dealing. *Allard* II, 112 Wn.2d at 147. Therefore, RCW 11.96.140 clearly can be, and has been, used to award fees absent bad faith or self-enrichment. In fact, the statutory language gives the court discretion in such matters, "as justice may require". Here, in order to make the trust beneficiaries whole, the trial court concluded that an award of attorney fees for the breach of the fiduciary's duty under an express trust was appropriate. This is a tenable basis for the award. But for the breach of fiduciary duty, there would have been no need for the beneficiaries to incur the fees.

Appellant next contends that the trial court should have allocated the attorney hours reasonably spent on the trust beneficiaries' claims, rather than allocating 60 percent of the total fees to the beneficiaries' claims based on the trust beneficiaries' 60 percent ownership of WBBC, since only the trust beneficiaries' claims were covered by RCW 11.96.140.

In support of its argument, the Bank cites to *Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 726 P.2d 8 (1986). Under *Fisher*

[w]hen a party recovers both on claims for which attorney fees are authorized and claims for which there is no such authorization, it is proper to limit the fee award to the legal services provided on the former claims.

*Fisher*, at 850 (citing *Nuttall v. Dowell*, 31 Wn. App. 98, 105, 639 P.2d 832, *review denied*, 97 Wn.2d 1015 (1982)).

However, the trial court's method of calculating fees is not foreclosed by *Fisher*. In *Fisher* there were some *claims* covered by the statute that awarded attorney fees and other claims that were not. In the present case, there are some *parties* whose claims were covered by the statute which allows attorney fees (the trust beneficiaries) and other parties whose claims were not (the heirs who signed the agency agreement). The court is faced with different issues when determining how much attorney time was spent working on separate claims, versus how much attorney time should be

allocated to different clients with the same claims. Here, there was no discernible difference between the fiduciary duty the Bank owed to the two classes of beneficiaries and, as we have determined, the statute of limitation issues were also essentially the same. So also were the damages issues essentially the same. The only appreciable difference here is that the claims of one group of plaintiffs are covered by RCW 11.96.140 and the claims of the other group are not. Therefore, the trial court's method for determining fees, based on the trust beneficiaries' 60 percent ownership of WBBC, was not improper.

## CONCLUSION

We affirm the trial court's decision, with the exception of modifying the judgment to increase the damage award to include the family's operating losses of $175,617. Pursuant to RAP 18.1 and RCW 11.96.140, the Gillespie trust beneficiaries are awarded reasonable attorney fees for defending the appeal and for the successful portion of the cross appeal. The amount of the award shall be determined by a commissioner of this court as provided in RAP 18.1(d), (e) and (f). We remand for entry of a modified judgment as provided herein.

COLEMAN and FORREST, JJ., concur.

Review denied at 123 Wn.2d 1012 (1994).