[No. 30506-9-I.    Division One.    December 6, 1993.]

NO KA OI CORPORATION, *Appellant,* v. NATIONAL 60
MINUTE TUNE, INC., ET AL, *Respondents.*

*Chris R. Youtz* and *Sirianni & Youtz,* for appellant.

*Anthony D. Shapiro* and *Rohan, Goldfarb & Shapiro,* for respondents.

PEKELIS, A.C.J. — No Ka Oi Corporation (NKO) appeals the trial court's rulings on its claim for damages against

National 60 Minute Tune, Inc., and its parent corporation, Precision Tune, Inc. NKO contends the trial court erred in dismissing its claim for lost profits and for the value of its contractual franchise rights. NKO also contends the trial court abused its discretion in determining the amount of attorney fees to be awarded.

The defendants cross-appeal from the trial court's award of attorney fees, costs, and exemplary damages under the Consumer Protection Act.

## I

NKO was formed by David Mickelson and Colin Wallace in 1987. At the time, Wallace was the president and principal shareholder of National 60 Minute Tune, Inc. (National), a franchisor of "60 Minute Tune" automobile tune-up and service franchises in the Western United States.[1] NKO obtained from National the right to be National's area representative for the state of Hawaii. NKO and National entered into an "Area Representative Agreement" (Agreement) which gave NKO the exclusive rights to sell or own up to 10 60 Minute Tune franchises in Hawaii for 25 years.[2] According to the Agreement, NKO would receive 75 percent of the franchise fees and royalties from 60 Minute Tune franchises sold in Hawaii. In exchange for the Agreement, NKO executed an unsecured promissory note in the amount of $47,500.

In 1989, Mickelson, on behalf of NKO, made two trips to Hawaii to investigate and develop the Hawaii market for 60 Minute Tune franchises. Meanwhile, NKO was attempting to secure the registrations necessary to do business as a subfranchisor in Hawaii. In order for NKO to be properly registered to sell franchises, it was necessary that National be properly registered as a franchisor as well.

---

[1] In August 1988 Wallace resigned from NKO and transferred his 50 percent interest in the company to Mickelson in exchange for $500, which Mickelson never in fact paid.

[2] At this time, National and NKO also entered into a franchise agreement for the first store, which was to be owned by NKO.

NKO experienced several problems in becoming registered, however. Additionally, in April 1989 National franchisees were notified of a pending merger of National and Precision Tune, Inc. (Precision Tune) a nationwide franchisor of tune-up and service franchises. Because of the pending merger, the State of Hawaii suspended National's registration in August 1989 and required National to modify its filing to reflect its acquisition by Precision Tune. Subsequently, when NKO submitted site selection data to National and requested that National amend its registration in Hawaii, NKO was advised that these matters had been placed on hold and would be forwarded to Precision Tune.

NKO received no response from Precision Tune following Precision Tune's acquisition of National. Mickelson attempted to alert Precision Tune about the need to amend National's registration. He was at first told that Precision Tune believed NKO's rights had been sold and its franchise rescinded. Following further inquiries by Mickelson in 1990, Precision Tune advised NKO that it would not deal with NKO because its agreement with National had not been disclosed to Precision Tune during the acquisition.

Precision Tune did not amend National's Hawaii registration; instead, it allowed the registration to lapse. Subsequently, Precision Tune prepared an offering circular for prospective franchisees in Hawaii and marketed "Area Development Agreements" for Precision Tune franchises in Hawaii.[3]

NKO sued National and Precision Tune for breach of contract, tortious interference, and violation of the Franchise Investment Protection Act, RCW 19.100, and the Consumer Protection Act, RCW 19.86. National counterclaimed, seeking recovery on the note. On a motion for summary judgment, the trial court dismissed NKO's claim for lost profits, reasoning that NKO's proffered evidence "did not meet the case law criteria for evaluation of a prospective business on

---

[3]At some point following its acquisition of National, Precision Tune had decided that no further 60 Minute Tune franchises would be sold. Although there was evidence of third party inquiries about Precision Tune development agreements, it is undisputed that Precision Tune never sold any in Hawaii.

the basis of lost profits." The trial judge explained that under *Farm Crop Energy, Inc. v. Old Nat'l Bank*, 109 Wn.2d 923, 750 P.2d 231 (1988), NKO was obliged to produce evidence of lost profits based on comparisons with the same type of business in the same locale, which NKO had failed to do.

The case was tried to a jury. NKO sought damages for the value of its lost franchise rights. After NKO had presented its case in chief, however, the trial court directed a verdict for National and Precision Tune on this element of NKO's damages, reasoning that NKO's evidence was insufficient to establish "the going price" or the existence of prospective buyers at the price claimed by NKO to represent the value of its contract.

By special verdict, the jury found that Precision Tune had interfered with NKO's business relationship and had violated the Franchise Investment Protection Act, and that National had breached its contract with NKO. The jury further found that NKO did not owe any payment on the promissory note to National. On this basis, the jury awarded NKO $11,520 in damages against Precision Tune, and $4,967.77 against National.

NKO sought approximately $80,000 in attorney fees from both defendants.[4] The trial court denied most of the requested fees because the records provided by NKO's counsel did not adequately segregate the time spent on claims for which fees were not awardable. Consequently, the trial judge calculated the amount of attorney fees based only on what the judge "actually observe[d]". Thus, the trial court awarded a total of $31,378 in attorney fees, as well as $2,301.86 in costs and $4,240 in exemplary damages under RCW 19.86.090.

NKO appeals the summary judgment, the directed verdict, and the setting of attorney fees. National and Precision

---

[4]It is undisputed that an attorney fee award was authorized under the Consumer Protection Act (CPA), RCW 19.86.090, and the attorney fee provision in the promissory note. Although the jury found that Precision Tune had not independently violated the CPA, the jury did find that Precision Tune had violated the Franchise Investment Protection Act, which constitutes a per se CPA violation.

Tune[5] cross-appeal the awards of attorney fees, costs, and exemplary damages.

## II

The first issue is whether the trial court properly applied the so-called new business rule to prevent NKO from pursuing its claim for lost profits.

At one time the new business rule totally precluded an unestablished business from obtaining lost profits as damages. *E.g., Engstrom v. Merriam*, 25 Wash. 73, 64 P. 914 (1901). The rationale for the rule was that "[w]hen the business is in contemplation, but not established, profits that may be anticipated therefrom are too speculative, uncertain, and conjectural to become a basis for the recovery of damages . . . for the subsequent loss of such profits." *Webster v. Beau*, 77 Wash. 444, 452, 137 P. 1013 (1914).

The Supreme Court modified the new business rule in *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 16, 390 P.2d 377, 396 P.2d 879 (1964), deciding that recovery of lost profits is not barred when a reasonable estimation of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantially the same market conditions. 65 Wn.2d at 17; *accord, Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 476, 403 P.2d 351 (1965), *cert. denied*, 382 U.S. 1025 (1966). The *Larsen* court specifically held that expert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a "substantial and sufficient factual basis" rather than by mere "speculation and hypothetical situations". 65 Wn.2d at 19. This limitation on the new business rule was consistent with the rationale for the recovery of lost profits generally: When plaintiff provides a reasonable basis for estimating the loss, "there is nothing in the nature of

---

[5]Although both National and Precision Tune are parties to this appeal, we will hereinafter refer to the appellants collectively as Precision Tune, except where context requires otherwise.

future profits *per se* which would prevent their allowance . . ..
[E]ach case must be governed by its own facts." *Andreopulos
v. Peresteredes*, 95 Wash. 282, 285, 163 P. 770 (1917).

Here, NKO argues that its evidence of lost profits sufficed
to create a material issue of fact as to its damages. NKO
points out that the evidence relied upon by its expert came
from the ·profit history and profit projections of Precision
Tune's own national franchises and from Precision Tune's
sales projections provided to potential franchisees.

Precision Tune, on the other hand, points out that the
opinion of NKO's expert was not based on an examination of
"market conditions or profits of comparable businesses *oper-
ating in Hawaii*". Thus, Precision Tune insists all NKO's
evidence of lost profits was inherently speculative and hypo-
thetical because, as a matter of law, proof of the lost profits
of a new business must be based on the profits of similar
businesses "in the vicinity". *See Farm Crop*, 109 Wn.2d at
928.

NKO essentially admits its evidence supporting the claim
for lost profits did not comprise Hawaii tune-up franchise
businesses,[6] but responds that under the circumstances it
was not obliged to produce evidence of similar businesses
operating *in Hawaii*. Thus, the precise issue we must decide
is whether the absence of evidence of the profit history of
"local comparables" bars a claim for lost profits as a matter
of law.

On several occasions Washington courts have described
the *Larsen* test for lost profits of a new business as requiring
evidence of identical or similar businesses "in the vicinity".
*See Farm Crop Energy, Inc. v. Old Nat'l Bank*, 109 Wn.2d
923, 931, 750 P.2d 231 (1988); *Gillespie v. Seattle-First Nat'l
Bank*, 70 Wn. App. 150, 176, 855 P.2d 680 (1993) ("in the
same vicinity"); *Seattle-First Nat'l Bank v. Siebol*, 64 Wn.
App. 401, 408, 824 P.2d 1252, *review denied*, 119 Wn.2d 1010

---

[6]Although some of NKO's data was based on the presence of Midas Muffler
franchises in Hawaii, as well as gross-revenue figures derived from a co-owner of
a defunct Precision Tune franchise in Honolulu, this evidence did not clearly
establish the *profitability* of these enterprises.

(1992); *see also Long v. T-H Trucking Co.*, 4 Wn. App. 922, 927, 486 P.2d 300 (1971) (noting lost profit award was supported by "[e]xpert witnesses [who] testified as to the costs ordinarily incurred in logging areas like the one in question").

■ Even if the "local comparables" factor was intended to be a bright-line, sine qua non requirement, we decline to extend that bright line to the unique context of national franchising. Unwavering adherence to such a requirement, regardless of the facts and circumstances actually proved, would be anomalous. Indeed, the *Larsen* court held that the plaintiff had sufficiently proved that profits would have been realized even though "[t]here was no comparable [business] from whose history of profits [the damages] figure could have been entirely drawn, *for . . . there were no comparables.*" (Italics ours.) 65 Wn.2d at 19.[7] The rule articulated by the *Larsen* court is as follows:

> [L]ost profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses. . . ." . . . Where the fact is well established that profits would have been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences. . . .

65 Wn.2d at 17 (quoting *Barbier v. Barry*, 345 S.W.2d 557, 563 (Tex. Civ. App. 1961); 5 A. Corbin, *Contracts* § 1023, at 133 (1951)); *see also* Restatement (Second) of Contracts § 352, comment *b* (1981) ("damages [of a new business] may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like").

Here, proof of the nationwide character of the franchise business at issue provided an ample basis for computation of probable losses. It has come to be recognized that in the arena of franchise or chain stores, "courts are displaying increasing

---

[7]The *Larsen* court nevertheless modified (but did not reverse) the award of lost profits because it considered the volume of sales assumed by the plaintiff's experts to be speculative. 65 Wn.2d at 19-20.

reluctance to apply the new business rule" because of the inherent characteristics of franchise outlets, which "eliminate nearly all uncertainty." Note, *The New Business Rule and the Denial of Lost Profits*, 48 Ohio St. L.J. 855, 864 (1987) (citing *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399 (Ky. 1985); *Smith Dev. Corp. v. Bilow Enters., Inc.*, 112 R.I. 203, 308 A.2d 477 (1973)).

> When the franchisor is a national or regional franchisor with uniform advertising and quality control, and when there is available data on earnings and expenses and on failure and success ratios from similar locations, the franchisee can usually show lost profits with "reasonable certainty."

Note, at 864.

For example, in *Chicken Villa*, a Kentucky Fried Chicken franchisee sued the national franchisor for breach of contract. The Kentucky Supreme Court reversed the lower court rulings that lost profits were not an allowable measure of recovery for an unestablished business. The court expressly overruled the new business rule and then explained why the facts established that plaintiff's lost profits were certain enough to require a new trial on damages:

> No court . . . can elucidate a single definition of "reasonable certainty" which may be used as a yardstick in all cases. However, this is a case containing factors and elements which eliminate virtually all the uncertain variables. This is a national franchisor, with uniformity of national advertising, uniform quality control, earnings and expense figures on nearby and comparable locations, and an available history concerning success and failure ratios.

(Italics ours.) 701 S.W.2d at 401.[8]

Even without evidence of local comparables, the nature of a nationwide franchise dispels the original rationale for the new business rule, *i.e.*, "plaintiff is conducting a new business with labor, manufacturing and marketing costs unknown". *Larsen*, 65 Wn.2d at 16; *see also Gillespie*, 70 Wn. App. at 176 (upholding denial of lost profits where there were "too many

---

[8]Although the *Chicken Villa* court mentioned evidence of comparable locations, it does not appear that the court considered this one element to be dispositive. Rather, evidence of local comparables constituted but one aspect of the multifactor approach emphasized by the decision.

unknown factors"). These costs and the profit histories of existing franchise outlets *are* known and largely uniform; in fact the benefit of these certainties is what makes the franchise system attractive to potential franchisees.[9] It would be ill advised for the courts to impose a formal bar to recovery of lost profits when the context otherwise provides such a wealth of available profitability evidence.

■ It would be particularly inequitable to deny plaintiff lost profits where the plaintiff produces the best evidence available and it is sufficient to afford a reasonable basis for estimating loss. Here, NKO introduced the opinion of a qualified expert based on sales data from 300 Precision Tune franchisees around the country, as well as Precision Tune's own revenue projections in an offering circular used to sell franchises in Hawaii.[10] The fact that Precision Tune introduced some evidence that Hawaii is in some respects "unique" is not pertinent on summary judgment; the weight to be given to testimony as to whether the Hawaii franchises would have been as profitable is for the trier of fact to determine.

■ We further reject Precision Tune's argument that because NKO's expert had no franchise-specific experience, his testimony is no better than the speculative testimony deemed insufficient in *Farm Crop*. While NKO's expert apparently lacked experience in the automotive franchise industry, it cannot be said that he was necessarily incapable of offering a reasonably certain opinion, based on industry data and market conditions, about the profitability of such

---

[9]Exhibit 38 (60 Minute Tune brochure): " 'Perhaps the biggest advantage of a franchise is that the franchisor has already established a successful, well-known product or service. In addition, existing systems serve to maximize efficiency and returns on investment while minimizing problems. . . . [T]he franchise can immediately begin to reap the rewards of a consistent, continuous national advertising effort . . . [A] Franchisee's potential success is EIGHT TIMES GREATER than that of an independent businessman."

[10]Precision Tune argues that NKO's data is defective because it "extrapolate[s]" from the profitability of Precision Tune franchises rather than 60 Minute Tune franchises. This distinction, while perhaps relevant, does not demonstrate uncertainty *as a matter of law* where, as here, the franchise businesses are essentially identical and both are owned by the same corporate defendant.

an enterprise. Moreover, the defects in the expert testimony about fuel-alcohol plants in *Farm Crop* were far more extensive and problematic. In particular, the expert's "pro forma" profit projections were purely hypothetical because the expert knew of no existing plant with the assumed production record and he "knew nothing" of the profitability of plants actually in operation. 109 Wn.2d at 929-31. Here, by contrast, NKO's expert relied on extensive data from a sampling of the profit history of actual Precision Tune franchisees.[11]

■ Finally, there is no merit to Precision Tune's argument that NKO failed to establish that a profit would have been made because NKO was a "paper shell," and had failed to make a reasonable effort to develop the Hawaii market and to commence operations. The evidence adduced by the parties on this point was sharply conflicting, and the issue cannot be resolved as a matter of law.

We hold that NKO's evidence of lost profits was sufficient to withstand a motion for summary judgment on the issue of reasonable certainty. We reverse the order of summary judgment and remand the issue of lost profits for trial.[12]

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

WEBSTER, C.J., and KENNEDY, J., concur.

Review denied at 124 Wn.2d 1002 (1994).

---

[11]As for the fact that Precision Tune's own expert had franchise-related experience, it is axiomatic that on a motion for summary judgment the trial court has no authority to weigh evidence or testimonial credibility, nor may we do so on appeal.

[12]At oral argument, counsel for NKO advised the court that NKO had assigned error to the trial court's directed verdict as an alternative basis for reversal only. Hence, having ruled in NKO's favor on its lost profits theory, we need not reach the issue of damages for the prospective value of NKO's lost franchise rights.