[No. 4612–5–III.   Division Three.   March 17, 1983.]

PATRICK KEEGAN, ET AL, *Respondents,* v. GRANT
COUNTY PUBLIC UTILITY DISTRICT
No. 2, *Appellant.*

*Richard C. Fitterer* and *Milne, Lemargie & Fitterer,* for appellant.

*Richard E. Schultheis* and *Baird & White,* for respondents.

McINTURFF, J.—The Grant County Public Utility District 2 (PUD) appeals a jury finding of negligence stemming from the operation of its electrical system. We affirm as to liability but reverse and remand on the issue of damages.

The PUD operated a 3–wire overhead electrical distribu-

tion line near a farm owned by Dwight and Elizabeth Keegan but occupied by their son and his wife, Patrick and Denise Keegan. The electrical line ran near a row of poplar trees 100 to 150 feet in height. The PUD had an easement for removal of all brush and trees which might interfere with the construction, maintenance, and operation of the electrical line.

During the late afternoon of March 24, 1979, one of the overhead wires, carrying 7,620 volts of electricity, fell to the ground. A strong wind had been blowing and the trees were apparently blown into the power lines. A neighbor noticed the downed line and the resultant brush fire and called the PUD. The wire remained "hot" for about 1 hour, when a PUD employee deenergized the line. Ten minutes after the line was deenergized, the Keegan house burst into flames. The intensity of the fire was noted by the PUD employee who stated the house became engulfed in flames in a matter of minutes. He said the windows melted "like a piece of cellophane under a match." The house and its contents were totally destroyed.

The Keegans[1] claimed the PUD was negligent in its installation and maintenance of the power line; that it failed to properly trim the poplar trees; and that safety devices were not properly installed to stop the flow of electricity in the event of a downed line. They theorized the PUD's failure to perform its duty of properly trimming the trees caused the trees to blow into the power lines, breaking one and causing it to fall to the ground. They also contended the lack of proper safety devices allowed the power to surge into the ground for 1 hour and that this power found its way to the Keegans' underground metal water pipe, which carried it into the house, causing the fire. The PUD denied these claims and asserted the fire had a non-electrical cause and the loss was a result of the Keegans'

---

[1]Suit was filed by Patrick Keegan and Denise Keegan, his wife, and Dwight Keegan and Elizabeth Keegan, his wife. For the purposes of this opinion, the plaintiffs will be referred to as the Keegans.

negligence in failing to properly ground their electrical panel and their failure to have the required electrical inspections.

Following a lengthy trial, the jury found the PUD was negligent and awarded Dwight and Elizabeth Keegan $69,223 in damages. This amount was reduced one–third based on the jury's finding of their comparative negligence. Patrick and Denise Keegan were awarded $13,860 and were not found comparatively negligent.

The threshold consideration in this appeal concerns the standard of care owed by a supplier of electricity. Initially, we must remain mindful of the critical and oftentimes fatal consequences of electrical accidents. Because the Keegan family fortuitously left to go to town several hours before the fire, their damages were limited to the loss of property. The leading case, *Scott v. Pacific Power & Light Co.*, 178 Wash. 647, 35 P.2d 749 (1934), involved personal injuries resulting from a pole coming in contact with electrical lines. In *Heber v. Puget Sound Power & Light Co.*, 34 Wn.2d 231, 208 P.2d 886 (1949), the decedent came in contact with a broken transmission line. In *Vannoy v. Pacific Power & Light Co.*, 59 Wn.2d 623, 369 P.2d 848 (1962), a chimney sweep died from injuries sustained when an aluminum pole came in contact with an electrical line. In *Frisch v. PUD 1*, 8 Wn. App. 555, 507 P.2d 1201 (1973), severe personal injuries were sustained when a crane cable came in contact with a power line. In *Wray v. Benton Cy. PUD*, 9 Wn. App. 456, 513 P.2d 99 (1973), a juvenile was electrocuted while hunting when an irrigation pipe came in contact with a power line. In *Amant v. Pacific Power & Light Co.*, 10 Wn. App. 785, 520 P.2d 181 (1974), personal injuries were sustained when a crane boom came in contact with electrical lines. In *Estate of Celiz v. PUD 1*, 30 Wn. App. 682, 638 P.2d 588 (1981), two men were electrocuted when an aluminum pipe they were carrying came in contact with a power line. Needless to say, one who chooses to engage in the business of transmitting high voltage electricity is involved in an extremely dangerous and life threatening

endeavor.

■ The seminal statement regarding an electrical supplier's duty of care expressed in *Scott v. Pacific Power & Light Co., supra* at 649–51, has not been improved upon:

The care to be exercised by an electric company with respect to its wires is such as a reasonably careful and prudent person, having in view the dangers to be avoided and the likelihood of injury therefrom, would exercise under the circumstances in order to prevent injury.

"While the measure of duty resting upon electric companies in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence, to a close approximation to the view that they are insurers, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus; that is, such care as a reasonable man would use under the circumstances, and will be responsible for any conduct falling short of this standard. *The degree of care which will satisfy this requirement varies, of course, with the danger* which will be incurred by negligence, and must be commensurate with the danger involved, and, according to numerous decisions, *where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant,* to prevent such injury." 9 R. C. L. 1199.

"Electric companies are . . . bound to use reasonable care in the construction and maintenance of their lines and apparatus, that is, such care as a reasonable man would use under the circumstances, and will be responsible for any conduct falling short of this standard. It follows from this rule, that the amount of care necessary varies with the danger which is incurred by negligence, for a prudent and reasonable man increases his care with the increase of danger. If but little danger is incurred, as, for instance, when the wires carry only a harmless electric current, such, for instance, as the telegraph or tele-

phone current, only ordinary care may be required. *While if the wires carry a strong and dangerous current of electricity, so that negligence will be likely to result in serious accidents, and perhaps death, or if a harmless wire is in dangerous proximity to a high tension wire, a very high degree of care, indeed, the highest that human prudence is equal to, is necessary.* This is particularly true of electric light and electric railway wires, which carry a high tension current often of great danger. The rule is thus stated in a case in Massachusetts. 'The vigilance and attention required must conform to the nature of the emergency and the danger to which others may be exposed, and is always to be judged of according to the subject–matter, the danger and force of the material under the defendant's charge.' The question of whether or not reasonable care has been used is in all cases for the jury, except where the court, on undisputed facts, can say that no reasonable man would have acted in the manner complained of, or that a reasonable man must have acted in the manner complained of. Between these limits the whole question is for the jury. Furthermore, as in all actions for negligence the question of the conduct of the plaintiff is involved, and if he has been guilty of contributory negligence, that is, of conduct which a reasonable and prudent man would not have adopted under the circumstances, and this conduct has contributed directly to his injury, he cannot recover therefor." Croswell, Law of Electricity, § 234, pp. 205, 206.

(Italics ours.)

Under the rule enunciated in *Scott,* the standard of care varies according to the danger posed by the utility's activity. If the danger is minimal, the utility is held to conventional negligence concepts. But when the danger and the likelihood of injury is increased, the standard of care rises. When the utility's operation exposes the public to serious accidents or death, the utility is held to the highest degree of care human prudence is equal to. This sliding scale negligence standard has been consistently followed by our courts. *Vannoy v. Pacific Power & Light Co., supra* at 631–32; *Heber v. Puget Sound Power & Light Co., supra* at 235; *Estate of Celiz v. PUD 1, supra* at 685; *Amant v. Pacific Power & Light Co., supra* at 787–88; *Wray v. Benton Cy.*

*PUD, supra* at 458; *Frisch v. PUD 1, supra* at 557.

One of the factors to be considered in determining whether a utility has satisfied its duty of care is the practical operation of the utility. *Heber v. Puget Sound Power & Light Co., supra* at 235; *Scott v. Pacific Power & Light Co., supra* at 649–51; *but see Richardson v. United States,* 645 F.2d 731 (9th Cir. 1981).[2] Evidence concerning the utility's practical operation addresses whether the utility has conducted its operations under the known safety methods and the present state of the art. *See also* 29 C.J.S. *Electricity* § 39, at 1064–66 (1965); *Blankette v. Public Serv. Co.,* 90 Colo. 456, 10 P.2d 327 (1932). The admissibility of evidence relating to the practical operation of the utility is not an open door for the utility to argue the economic impact of safety measures on the ratepayers. The fact the requisite care is expensive or inconvenient does not, of itself, relieve the utility of its duty to exercise commensurate care. *See Scott v. Pacific Power & Light Co., supra* at 653; *McLaughlin v. Louisville Elec. Light Co.,* 100 Ky. 173, 37 S.W. 851 (1896); *Barnes v. Sand Mt. Elec. Coop.,* 40 Ala. App. 88, 108 So. 2d 378 (1958).

---

[2]In *Richardson v. United States, supra,* the Ninth Circuit analyzed the Washington cases discussing the duty of care of a utility. It concluded the utility's standard of care is not qualified by the practical operation of the utility.

The Washington courts, however, in *Vannoy* and its progeny, have chosen not to qualify the standard of care imposed on a utility by the words practical or practicable. While it is true that they have not expressly revoked the "compatible with practical operation" language from the standard enunciated in *Scott,* no cases since 1949 have included those terms in the standard of care imposed on a public utility. It would be unreasonable to infer that these later courts meant to include those words, especially since they are incompatible with the highest degree of care human prudence is equal to.

*Richardson,* at 734. We do not agree with the Ninth Circuit's analysis. The omission in recent Washington cases of the entire standard of care statement from *Scott* should not be construed as a revocation of the "practical operation of the utility" from consideration by the trier of fact. A consideration of the practical operation of the utility is intrinsically included in any analysis of whether the utility exercised due care. As discussed later in the opinion, the extent to which the utility will be allowed to present evidence relating to its practical operation is a discretionary matter for the trial court to be determined from the facts and circumstances of the case before it.

The extent to which a utility is allowed to present evidence relating to its practical operation will be determined by the circumstances of each case. A sliding scale approach proportional to that utilized for the standard of care should be used. If the danger posed to the public is minimal, then the utility should be afforded considerable latitude in presenting evidence of its practical operation. If the danger is lethal, then the practical operation becomes minimally relevant. The relevancy of evidence pertaining to the practical operation of the utility ultimately lies in the sound discretion of the trial court. *See* ER 401;[3] *see also Lamborn v. Phillips Pac. Chem. Co.,* 89 Wn.2d 701, 706, 575 P.2d 215 (1978).

In the present case, the jury was instructed:

> The Defendant was bound to use reasonable care in the construction and maintenance of its lines and apparatus; that is, such care as a reasonable man would use under the circumstances and the Defendant is responsible for any conduct falling short of that standard. What is reasonable care varies with the danger that is incurred by negligence, for a reasonable man increases his care with the increase of danger. If the wires of the Defendant carried a strong and dangerous current of electricity so that negligence on the part of the Defendant would be likely to result in serious accidents or harm, then the Defendant owed the Plaintiffs the highest degree of care, the utmost care and prudence, consistent with the practical operation of the Defendant's electrical distribution facilities, to avoid accident or injury.

Instruction 12. Although not a model instruction, we find it adequately instructed the jury on the standard of care for an electrical supplier.

The PUD contends the trial court erred in not allowing it to present evidence which explains electricity, the total operation of its system, and its tree trimming practices

---

[3]ER 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

throughout the district. It argues this evidence was necessary to allow the jury to consider the practical operation of the utility as it relates to the standard of care.

The trial court exercised its discretion and limited the PUD's presentation of evidence pertaining to its practical operation to matters directly affecting the Keegan fire. The PUD was not allowed to present testimony of its overall operation and economics and testimony of tree trimming practices was limited to those applicable to the trees on or near the Keegan property. To conclude an abuse of discretion has occurred, we are required to find that no reasonable person would have ruled as the court did. *State v. Huelett,* 92 Wn.2d 967, 969, 603 P.2d 1258 (1979). The trial court's ruling limited, but did not preclude, the PUD from presenting the practical aspect of its operation to the jury. We hold there was no abuse of discretion.

The PUD further contends the trial court erred in ruling that its appraisal expert, Oliver Click, was not qualified to testify as an expert witness. The net effect of this ruling was to submit the case to the jury without a valuation figure from the PUD. The only valuation presented to the jury was a $60,000 figure provided by Elizabeth Keegan. Mr. Click would have testified the fair market value of the Keegan house was $36,000. The jury later determined damages to the elder Keegans for the loss of their house and personal property amounted to $69,223. It is unclear what portion of the damages award represented the value of the house and what effect a second valuation figure would have had on the jury's determination of damages.

Expert testimony is permitted to assist a trier of fact in understanding evidence or issues. ER 702. Whether a witness is qualified to testify as an expert on a particular subject is a discretionary question for the trial court. *Walker v. Bangs,* 92 Wn.2d 854, 858, 601 P.2d 1279 (1979).

If the reasons for admitting or excluding the expert testimony are "fairly debatable" the trial court's exercise of its discretion will not be reversed on appeal. *Walker,* at 858; *Hill v. C. & E. Constr. Co.,* 59 Wn.2d 743, 746, 370 P.2d 255

(1962). We hold the reasons for excluding Mr. Click's expert testimony are not "fairly debatable" and that the trial court abused its discretion in not allowing the testimony. Therefore, we must reverse the damages portion of the judgment.

■■ A witness may be qualified as an expert by his knowledge, skill, experience, training or education. ER 702. The PUD established that Mr. Click had been an appraiser for the Bureau of Reclamation for approximately 10 years and held the position of chief appraiser for that agency. Since then, he has performed appraisals for banks, mortgage companies, the Colville Federated Tribes, federal agencies including FHA and VA, and private individuals. On the basis of this experience, Mr. Click was qualified to express his expert opinion as to the value of the Keegan home. The trial court excluded Mr. Click's testimony due to his lack of experience in appraising residential real estate and because he was not licensed by the State of Washington to sell real estate.[4] Neither reason can support the exclusion. Once the basic requisite qualifications are established, any deficiencies in an expert's qualifications go to the weight, rather than the admissibility, of his testimony. *In re Young*, 24 Wn. App. 392, 397, 600 P.2d 1312 (1979); *Larson v. Georgia Pac. Corp.*, 11 Wn. App. 557, 560, 524 P.2d 251 (1974). The fact that Mr. Click was not licensed to

---

[4]The trial court, in ruling on the Keegans' objection, stated:

"I'm going to sustain the objection. The court doesn't have any doubt Mr. Click may have been eminently qualified for his work for the Bureau. In fact, that would appear that was the case if he arose to be Chief Appraiser for the Bureau of Reclamation. But, the court can take judicial notice that the Bureau of Reclamation is in the business primarily of farm land and the water services and canals that serve that. It's not to say that it may or may not have some interest occasionally in a house or some other building, but 99 percent of the Bureau is concerned with agricultural land and the water works that serve that.

"So, I don't find anything in service, no matter how lengthy or distinguished as a Bureau of Reclamation appraiser, to qualify a person to appear as an expert on residential properties. Likewise, not being a realtor, I find nothing in his experience that qualifies him . . .

"Based on what's presented, I'm sustaining as far as his qualifications to appraise residential real estate . . ."

sell real estate in this state goes to the weight and not the admissibility of his testimony. *Walker,* at 859.

Finally, the PUD contends the trial court erred in giving instruction 16 on nondelegable duty. Instruction 16 reads:

> One upon whom the law has imposed a duty of care cannot avoid his responsibility for its faithful discharge by contracting with another for its performance. This is called a "nondelegable duty".

The PUD's customer service supervisor testified the PUD had an unwritten policy concerning tree trimming and, in recent years, tree trimming had been contracted out to private contractors. The Keegan trees had been trimmed in 1979 by one of these private contractors.

The trial court correctly instructed the jury that the duty of an electrical utility is a nondelegable duty.

> Electricity has traditionally been considered extremely dangerous and the duty of exercising a high degree of care is placed upon those dealing with it. . . . [Electricity is] an imminently dangerous agency which places upon the individual dealing with it, a nondelegable duty to see that reasonable means are taken to protect those who come into contact with it. Failure to fulfill that duty results in liability on the part of such individual, even though the plaintiff's injury resulted in whole or in part from the acts or omissions of an independent contractor employed to perform the particular work.

*Pierce v. United States,* 142 F. Supp. 721, 728–29 (E.D. Tenn. 1955), *aff'd,* 235 F.2d 466 (6th Cir. 1956); *see also* 29 C.J.S. *Electricity* § 38, at 1060 (1965); *Community Pub. Serv. Co. v. Baker,* 605 S.W.2d 622 (Tex. Civ. App. 1980). The subject of delegable duties became relevant when the PUD offered testimony that it had contracted out its tree trimming responsibilities.

We hold the trial court committed reversible error in not allowing Mr. Click to testify. However, this does not require the entire matter be remanded for a new trial. The case was submitted to the jury with the issue of the PUD's negligence, the Keegans' negligence, and damages all decided separately in answer to special interrogatories.

There is no reason to relitigate the liability issue. Courts have the authority to limit issues on a new trial in those cases where it clearly appears that the original issues were distinct and separate from each other and that justice does not require the resubmission of the whole case to the jury. *McCurdy v. Union Pac. Ry.,* 68 Wn.2d 457, 471, 413 P.2d 617 (1966); *Nelson v. Fairfield,* 40 Wn.2d 496, 501, 244 P.2d 244 (1952).

The judgment of the Superior Court relating to the PUD's liability for the Keegans' loss is affirmed; but the case is remanded for a new trial on the issue of damages only.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, will not be published.

ROE, C.J., and GREEN, J., concur.