[No. 11811-8-III.   Division Three.   May 25, 1993.]

SIMONA H. MARTINEZ, *Individually and as Personal Representative,* ET AL, *Appellants,* v. GRANT COUNTY PUBLIC UTILITY DISTRICT NO. 2, *Respondent.*

*Douglas D. Peters, Robert E. Lawrence-Berrey, Jr.,* and *Peters, Fowler & Inslee, P.S.,* for appellants.

*Richard E. Schultheis* and *Schultheis Law Offices,* for respondent.

SHIELDS, C.J. — Jose Martinez was electrocuted when he lifted an irrigation pipe into high voltage transmission lines servicing the farm unit where he worked. His survivors brought this wrongful death action against Grant County Public Utility District No. 2 (PUD). From the judgment entered on a jury verdict in favor of the PUD, Simona Martinez appeals. She contends the court committed reversible error by admitting evidence of the overall increased costs of making high voltage transmission safer and the projected economic impact of the increased costs on ratepayers. We affirm.

On March 15, 1989, Mr. Martinez and another employee of Fode Farms were servicing irrigation pumps. They drove to a parcel of open-field farmland known as Unit 80, Block 41. While the other employee opened a gate, Mr. Martinez moved a 32-foot mainline irrigation pipe that was blocking access to the field. Mr. Martinez was electrocuted when the pipe contacted the uninsulated 7,620-volt wire located 27 feet 5 inches overhead.[1] In December 1989, his wife and children sued the PUD, alleging negligence.

At trial in June 1991, the plaintiffs asserted alternate theories of liability: (1) the PUD was negligent in its construction of the transmission lines in 1967; and (2) even if the transmission lines were properly built, the PUD was negligent for failing to take remedial steps when it became aware that local farmers were stacking and using 32-foot and 40-foot metal irrigation pipes within range of its high voltage transmission lines.. The plaintiffs introduced evidence the accident could have been avoided if the PUD had raised the transmission lines higher, buried the lines, used insulated wire, or fenced the land under the lines.

The PUD introduced evidence that the transmission lines were built in 1967 to substantially exceed then-existing safety standards which required the lines to be at least 20 feet above

---

[1] The underlying facts are apparently undisputed, but some of those we set forth appear in the appellants' brief and do not appear in that portion of the transcript prepared for appeal.

ground and that those same standards were still in effect when the accident occurred. The PUD then introduced evidence showing the plaintiffs' proposed remedial measures would not reduce the overall hazard of electrocution, were not technically feasible, or would substantially reduce system reliability. Raising the lines to reduce the risk to farm workers would increase the risk to crop dusters. Burying the lines would increase the risk of electrocution from digging into them. Buried lines also fail more frequently and wear out much earlier. Current methods of insulating overhead wires are ineffective. Purchasing the rights of way under the lines and fencing them so people could not get close to the lines would create serious access problems. The PUD was allowed over objection to present evidence of the overall costs of implementing each of the plaintiffs' proposed safety measures and the impact those increased costs would have on ratepayers. The jury found the PUD was not negligent.

Washington recognizes the societal necessity of transmitting lethal amounts of electricity through uninsulated overhead power lines through rural areas; it does not impose strict liability on electrical power companies for injuries arising out of contact with those power lines. *Hernandez v. George E. Failing Co.*, 28 Wn. App. 548, 550-51, 624 P.2d 749 (1981). Because the utility district is not subject to strict liability, negligence must be established. In general terms, to establish negligence a plaintiff must prove breach of a duty of care which results in an injury proximately caused by the breach. *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992). Here, the burden was on Mr. Martinez' survivors to show the PUD had a duty to take some precaution it did not take.[2]

The parties agree on PUD's high duty of care: its transmission system, designed to carry 7,620 volts of electricity, must be constructed and maintained with the utmost care and prudence consistent with the practical operation of its plant to prevent serious injury or death. *Keegan v. Grant Cy.*

---

[2] The jury's finding that the PUD was not negligent in its construction of the lines, inherent in its verdict, is not challenged.

*PUD 2*, 34 Wn. App. 274, 278, 661 P.2d 146 (1983) (citing *Scott v. Pacific Power & Light Co.*, 178 Wash. 647, 649-51, 35 P.2d 749 (1934)). They disagree as to whether the jury should have been allowed to consider the costs of the plaintiffs' proposed safety measures, considering the fact the jurors were all ratepayers. The sole issue on appeal is whether the admission of evidence of those costs was reversible error.

ER 403 authorizes the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The trial court has broad discretion in balancing the probative value of evidence against the potentially harmful consequences that might result from its admission. *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 256, 744 P.2d 605 (1987). Its ruling will not be overturned absent a showing it was based on untenable grounds or untenable reasons, considering the purposes of the trial court's discretion. *Coggle v. Snow*, 56 Wn. App. 499, 507, 784 P.2d 554 (1990) (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

The plaintiffs established the PUD knew farmers in the area use metal irrigation pipe in lengths which can reach high voltage lines and that it is common practice throughout the county for farmers to store those pipes under the lines. That knowledge does not by itself mandate alteration of existing electrical transmission lines otherwise satisfactorily designed and maintained.[3] *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, 513, 657 P.2d 546, 552 (1983). *Scott* and *Keegan* indicate the practical operation of a utility district is a factor to be considered in determining whether the PUD

---

[3]As an alternative, it is possible that the PUD could satisfy any additional duty through public education. The record on appeal is scanty, but there is evidence the PUD routinely runs bilingual safety ads on six radio stations broadcasting within the county, in two weekly "shopper" publications, and in two daily and four weekly newspapers. We cannot determine that these facts were presented to the jury, but there was testimony from the PUD's safety officer that he presented a slide show and safety lecture to each class on irrigation circle maintenance and repair conducted at Big Bend College in Moses Lake. The classes were attended by farm employees, including Mr. Martinez.

had a duty to change the existing lines. Ms. Martinez concedes "economic cost" is a factor in determining "practical operation". The narrow issue is what economic-cost evidence is properly admissible.

■ *Keegan* holds the evidence which the PUD is allowed to present relating to its practical operation will depend on the circumstances of each case:

> A sliding scale approach proportional to that utilized for the standard of care should be used. If the danger posed to the public is minimal, then the utility should be afforded considerable latitude in presenting evidence of its practical operation. If the danger is lethal, then the practical operation becomes minimally relevant. The relevancy of evidence pertaining to the practical operation of the utility ultimately lies in the sound discretion of the trial court.

*Keegan*, at 281.

Ms. Martinez contends that, because the voltage was lethal, under *Keegan* the trial court should have excluded all evidence of the overall costs of implementing her proposed safety modifications. Under no circumstances, she argues, was it permissible to admit testimony about the effect of increased costs on ratepayers because *Keegan* prohibits such evidence outright. We do not believe *Keegan* requires such a result.

■■ First, *Keegan* clearly does not preclude all evidence of costs. Just because the PUD physically could have raised, buried, insulated or fenced off its 7,620-volt transmission lines, thus preventing this accident, does not automatically mean it had a duty to do so without regard to cost.

Second, there are significant differences between *Keegan* and this case. In *Keegan*, the complaint alleged the PUD caused a fire by negligently failing to keep a row of poplar trees trimmed, despite a history of power interruptions and brownouts at the Keegan house from contact between the trees and the nearby high voltage line. The PUD tried to introduce evidence explaining electricity generally, its entire operation from dams to distribution, and its tree-trimming practices throughout the district. The trial court rejected such broad testimony because it was not relevant to the circumstances causing the fire and limited the evidence to

testimony about the trimming of trees on or near the Keegan property. On appeal, this court held the trial court's limitation of the evidence was within its discretion and there was no abuse. There was no claim in *Keegan* that the PUD was negligent in its district-wide practices.

The present case is quite different. The PUD's duty suggested in this case would extend to the many miles of virtually identical lines servicing irrigated farm units throughout Grant County. Whether it has a duty to modify depends in part on whether the proposed modifications are prudent and reasonable, and are consistent with the practical operation of the utility. *Scott*, at 649-51; *Keegan*, at 280. Economic costs are relevant to that inquiry, as the trial court concluded.

The court explained why it allowed the PUD to present evidence of overall costs associated with the proposed safety measures.

> I have ruled that, even in light of Keegan, that when the plaintiff takes a position that there's certain remedial measures that could have been done, that the defendant is certainly entitled to establish the feasibility and cost of those remedial measures. In other words — And that is a different issue than the question of whether or not this construction, at the time, was negligent. There are two issues there. The issue about whether it complied with code, or whether it was negligent in its construction at the time, has nothing to do with these costs.
>
> But there is a second issue that has been injected in the case, as I see it, from the testimony, and from some of the proposed instructions, and that is that if it was properly installed at the time, that the District should have taken some remedial measures of some sort to protect against the injury now. And it's on that issue that the question of cost of remedial measures is relevant. Although Keegan says it's minimally relevant.

The court also explained that it allowed the PUD to show the effect of proposed remedial measures on rates because jurors would have no way of determining practicability from the raw figures, which ranged from $72 million to $259 million:

And the jury, from the evidence they've heard, is certainly going to make some — draw some inference, one way or the other, about the effect that these costs would have on ratepayers. Because they don't have any guidance in that. I think that they're entitled to hear the evidence of the effect on cost of delivering energy to households in order to decide whether it's practical. I don't know how a jury would know if 72-million dollars in the PUD is peanuts or the farm. . . .

. . . .

You see, the other problem I have is that the jury might speculate that 72 million dollars, which is the least expensive of the alternatives, would result in a doubling of the rates. They don't know how much. They may then, on their own, draw conclusions that that cost would have a greater impact than it would, so I think they're entitled to know the actual facts.

The evidence relating to overall costs and increased rates was potentially prejudicial. The court noted its concern, but concluded the danger of unfair prejudice did not substantially outweigh the probative value of the evidence, which was necessary to give the jurors a frame of reference. The court indicated it would, and in fact did, limit the prejudicial effect by instructing the jury that the fact the requisite care is expensive or inconvenient does not, of itself, relieve the PUD of its high standard of care. It did so in instruction 10, which reads:

The degree of care required of the defendant in the construction and maintenance of its lines is the highest degree of care that human prudence is equal to, consistent with the practical operation of its facility to prevent injury.

The fact that the required care is expensive or inconvenient does not, by itself, relieve the defendant of its duty.

The failure, if any, of the defendant to meet the duty of care required by these instructions is negligence.

It also limited the evidence, and argument, to the issue of practicality.

"Unfair prejudice" as the term is used in ER 403 refers to prejudice which results from evidence that is more likely to arouse an emotional response than a rational decision by the jury. *Lockwood*, at 257; 5 K. Tegland, Wash. Prac., *Evidence*

§ 106, at 349 (3d ed. 1989). The issue in this case was admittedly a close one. Had the overall cost estimates and their breakdown been the only evidence against the plaintiffs' assertion of a duty to take remedial measures, Ms. Martinez would have a persuasive argument. However, in light of the other evidence that the proposed safety measures would not reduce the overall risk and/or could not be implemented without seriously reducing the system's reliability, the evidence at issue was not unfairly prejudicial. Given the constraints imposed by the court, and the cautionary instruction taken from *Keegan*, admission of the evidence was not an abuse of discretion.

We affirm.

THOMPSON and SWEENEY, JJ., concur.

Review denied at 122 Wn.2d 1020 (1993).