23 P.3d 529 (2001)
106 Wash.App. 260
John T. and Margaret L. KAECH, husband and wife, and the marital community comprised thereof, d/b/a Klaber Valley Farm, Respondent/Cross-Appellant,
v.
LEWIS COUNTY PUBLIC UTILITY DISTRICT NO. 1, Appellant/Respondent.
No. 22947-1-II.
Court of Appeals of Washington, Division 2.
May 18, 2001.
*532 Craig P. Campbell, Mark Robert Johnsen, Barbara J. Brady, Karr Tuttle Campbell, Seattle, for Appellants.
Paul David Doumit, Doumit & Doumit, Olympia, for Respondents. *530
*531 ARMSTRONG, C.J.
John and Margaret Kaech sued the Lewis County Public Utility District, No. 1 (PUD), claiming "stray voltage" harmed their dairy cows. The jury awarded Kaech $1,089,000. The PUD filed a notice of appeal and also moved for judgment notwithstanding the verdict (NOV) and for a new trial. The trial court denied the motion for judgment NOV, but granted the motion for a new trial ruling that the evidence did not support the jury's damage award.
Kaech appeals the order granting a new trial. The PUD argues that the trial court erred in (1) allowing Kaech's liability expert to testify to a theory of stray voltage not supported in the scientific community, (2) allowing Kaech's damages expert to project *533 business losses for a new business, and (3) allowing John Kaech to testify to a reduced value of the farm when there was no evidence that any stray voltage damaged the real property. Kaech argues that the trial court lacked jurisdiction to grant a new trial because the PUD did not timely serve the motion and that the court erred in dismissing his claims for nuisance, trespass, and negligent misrepresentation. We find no error in the court's rulings on the scope of the expert testimony, but we hold that the court erred in granting the new trial because the PUD did not timely serve the motion. We also hold that the evidence did not support the claim for damage to the real property. Accordingly, we reverse the order granting a new trial and the judgment. We remand for a new trial limited to the issue of damages.

FACTS
John Kaech grew up on his family's dairy farm near Centralia. In 1990, John and his wife, Margaret, purchased a dairy farm in Lewis County. In August 1991, Kaech began operating the dairy farm with a herd of 150 cows.[1]
In the spring of 1992, Kaech noticed problems with the herd. The cows were nervous during milking, often kicked at the milking machines, and were not breeding. They were not drinking a normal amount of water and their milk production dropped off. They also did not want to go into the barn. Kaech checked the cows' water and milking procedures, but he found nothing unusual.
In June 1992, Kaech discovered unexplained voltage readings in the barn. He turned off all the power on the farm and still found voltage in the barn.[2] Kaech called the PUD, who sent Ken Powell to investigate. Powell found two volts in the barn, but he could not explain the cause.
On July 6, 1992, David Muller, the PUD's chief engineer, visited Kaech's farm. After Kaech showed Muller some dark spots on an insulator, Muller said that they might be causing the voltage problem. Muller said he would check into it and report back. During this time, Kaech continued to check the water, feed, and milking procedures, hoping to pinpoint the problem. He also contacted the Bonneville Power Administration (BPA) to see if they had any explanation. The BPA set up meters on the farm to measure voltage.
From July to August 1992, the cows' milk production continued to decline, prompting Kaech to contact Gary Kalich, the PUD's manager. Kalich told Kaech: "[W]e're either going to fix your problem or convince you you don't have one." RP at 985. The PUD wrote Kaech telling him he did not have a "stray voltage"[3] problem, however, the problems continued throughout 1993.
*534 In October 1994, Rick Snelson, an employee with the PUD, visited Kaech's farm to repair "the secondary neutral between the barn and the transformer pole." RP at 997. Kaech showed Snelson the insulators on the transformer pole and asked if this might be the problem. Snelson said that the insulators looked bad and could be the source of the problem. He said he would notify the PUD to replace the insulators. Kaech waited for the PUD to send a repair crew but nobody showed up.
On October 17, 1994, Kaech called and told Kalich they could see the insulators leaking. In early November 1994, the PUD replaced the insulators and the transformer. After this, the cows entered the barn more regularly and began producing higher milk volumes; calf survival rates also improved.
Kaech sued the PUD for negligence, nuisance, trespass, inverse condemnation, and intentional and negligent misrepresentation, claiming the leaking insulators allowed "stray voltage" to affect the dairy herd. At the end of the plaintiff's case, the court granted the PUD's motion to dismiss the trespass, nuisance, and misrepresentation claims. The jury found the PUD negligent and awarded Kaech $1,089,000.
The trial court entered judgment on January 16, 1998. On January 26, 1998, the PUD filed a motion for judgment NOV and a motion for a new trial. On January 27, 1998, the PUD served the motions on Kaech. Within 30 days of the judgment, the PUD appealed. On February 27, 1998, Kaech cross-appealed the trial court's order dismissing the nuisance, trespass, and misrepresentation claims.[4] The trial court denied the motion for judgment NOV but granted the motion for a new trial. Both sides appeal.

ANALYSIS

I. Motion For a New Trial
Kaech argues the trial court erred in granting the motion for a new trial because the PUD did not serve the motion within the 10-day period as required by CR 59(b).[5] The PUD argues that if it failed to meet the service deadline for a motion for a new trial, a CR 50 motion allows the trial court "to reopen the judgment and grant a new trial." Br. of Resp't at 29.
When a party moves for a new trial, CR 59(b) requires that the "motion ... shall be served and filed not later than 10 days after the entry of the judgment." CR 59(b). The trial court may not extend the time for filing a CR 59(b) motion. CR 6(b)(2); Schaefco, Inc. v. Columbia River Gorge Comm'n, 121 Wash.2d 366, 367-68, 849 P.2d 1225 (1993); Metz v. Sarandos, 91 Wash.App. 357, 360, 957 P.2d 795 (1998); Moore v. Wentz, 11 Wash.App. 796, 799, 525 P.2d 290 (1974). But CR 50(b) does not require a motion for judgment NOV to be served within 10 days, and it allows a CR 59 motion for a new trial to be joined with the motion for judgment NOV.
Here, the PUD did not serve its motions within 10 days of the judgment date. Kaech moved to strike the motions, but the trial court denied the motion, ruling that the CR 59 motion was timely because it was joined to the CR 50 motion. But nothing in either CR 59 or CR 50(b) excuses the 10-day service requirement of CR 59. The CR 59 service requirement is mandatory. Since the motion for a new trial was untimely, the trial court lacked authority to order a new trial. Metz, 91 Wash.App. at 360, 957 P.2d 795.

II. PUD Appeal
The PUD argues that Kaech improperly testified about his real property damage because the court had dismissed the trespass claim. The PUD also argues that Kaech's damage calculations were determined "without any formula, method or basis in fact." Br. of Resp't at 23. An owner of real property may testify as to the value of his or her property. Port of Seattle v. Equitable Capital Group, Inc., 127 Wash.2d 202, 211, 898 P.2d 275 (1995) (quoting Cunningham v. Tieton, 60 Wash.2d 434, 436, 374 P.2d 375 (1962)).
*535 Here, John testified about the decline in the farm's value as follows:
Q: Since this has happened, Mr. Kaech, what if anything has happened to the value of your farm?
A: It's declined.
Q: When your farm was up and running with 150 cows on it and milking, do you have an opinion as to the value of that farm?
A: I feel it would be worth about $750,000.
Q: Why do you say that?
A: Well, because it was fully operational, having a sustainable cash flow.
Q: And today in the condition that it is in, do you have an opinion as to what the value of the property is?
A: It's going to be sold on the 19th [of December].
Q: What's the value?
A: I think around $165,000.
RP at 1014-15. But neither John nor any other witness testified that the stray electricity damaged his real property. Rather, the only evidence of damages was Dr. Behr's calculation based upon milk loss. This calculation included the diminished value of the cow herd because of young stock loss and "cull cow" loss. Br. of Appellant at 16, n. 4.
Yet the jury was instructed:
If your verdict is for the Plaintiffs, you must first determine the amount of money required to reasonably and fairly compensate Plaintiffs for the total amount of damages, apart from any consideration of contributory negligence.
If you find for Plaintiffs, your verdict may include the following:
(1) The fair market value of any lost milk production;
(2) The difference between the fair market value of any property damaged immediately before the occurrence and its fair market value immediately thereafter.
CP at 208.
Although the PUD did not object to John's testimony about the loss in farm value, it objected to submitting the claim for loss based upon the decreased value of the farm to the jury. There was no evidence to support this claim. John testified that the farm decreased in value because of declining milk production and damage to the herd. But the jury was allowed to consider not only the loss from milk production but also other damage to property based upon "[t]he difference between the fair market value of any property damaged[.]" CP at 208. There was no evidence of property damage, other than what was included in the calculation of milk loss. The PUD is entitled to a new trial on damages.

III. Judgment NOV
The PUD contends, for several reasons, that it is entitled to judgment NOV. In reviewing a post-trial motion for judgment NOV, we review the evidence and all reasonable inferences in a light most favorable to the non-moving party. Moore v. Wayman, 85 Wash.App. 710, 719, 934 P.2d 707 (1997); Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha, 126 Wash.2d 50, 98, 882 P.2d 703 (1994). If the verdict is supported by "competent and substantial evidence ... then the verdict must be permitted to stand." Moore, 85 Wash.App. at 719, 934 P.2d 707. There is no discretion involved and "[s]uch a motion can be granted only when it can be said, as a matter of law, that there is no competent and substantial evidence upon which the verdict can rest." Moore, 85 Wash.App. at 719, 934 P.2d 707; Queen City Farms, 126 Wash.2d at 98, 882 P.2d 703. "If there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury." Levy v. North Am. Co. for Life & Health Ins., 90 Wash.2d 846, 851, 586 P.2d 845 (1978).
A. Negligence
The PUD argues that Kaech did not prove that the PUD departed from the applicable standard of care. Specifically, the PUD argues that Kaech did not establish that a reasonably prudent electrical utility should have known that the insulator could cause stray voltage, or that the PUD was *536 negligent in its manner in responding to Kaech's concerns.[6]
An electric company owes a duty of care to maintain its electrical systems with "the utmost care and prudence[.]" Keegan v. Grant County PUD No. 2, 34 Wash.App. 274, 278, 661 P.2d 146 (1983) (quoting Scott v. Pacific Power & Light Co., 178 Wash. 647, 649-51, 35 P.2d 749 (1934)); Martinez v. Grant County Public Util. Dist. No. 2, 70 Wash.App. 134, 137-38, 851 P.2d 1248 (1993). "[T]he standard of care varies according to the danger posed by the utility's activity." Keegan, 34 Wash.App. at 279, 661 P.2d 146.
If the danger is minimal, the utility is held to conventional negligence concepts. But when the danger and the likelihood of injury is increased, the standard of care rises. When the utility's operation exposes the public to serious accidents or death, the utility is held to the highest degree of care human prudence is equal to.
Keegan, 34 Wash.App. at 279, 661 P.2d 146. Here, the voltage and risk of danger in question were relatively low. Cattle are sensitive to current levels humans seldom perceive,[7] thus the standard of care is ordinary negligence.
Viewing the evidence and all reasonable inferences in a light most favorable to Kaech, there is substantial evidence that the PUD breached its duty of ordinary care. Several PUD employees were aware of Kaech's voltage problems, yet the PUD failed to reasonably investigate and repair it. Kaech testified that he found stray voltage in his barn in 1992 and he called the PUD to investigate. The PUD sent Ken Powell to investigate the claim. David Muller, the PUD's chief engineer, also visited the farm and mentioned a possible insulator problem. Muller said he would look into it and report back. Kaech spoke with Gary Kalich, the PUD's manager, who said: "[W]e're either going to fix your problems or convince you you don't have one." RP at 985. Despite being aware of a voltage problem stemming from the insulators, the PUD wrote Kaech and told him that he did not have a "stray voltage" problem. RP at 991; Exhibit 95. But Rick Snelson, a PUD employee, commented that the insulators could be the problem. Snelson said he would inform the PUD and someone would replace the insulators. Kaech reported to the PUD that he could see the insulators leaking. The PUD, however, did not respond to this call for about two weeks, and it did not replace the insulators until November 1994, nearly two years after Kaech's initial complaint.
Viewing the evidence and all reasonable inferences in favor of Kaech, there is substantial evidence to sustain the jury's verdict. The trial court did not err in denying the motion for judgment NOV based on this issue.
B. Expert Testimony
The PUD argues that the trial court erred in allowing Professor Bodman to testify that stray voltage can leak from an insulator. The PUD concedes that Bodman is a recognized expert in stray voltage, but it argues that he is not an expert on whether a faulty insulator can cause stray voltage.
The question is whether Bodman's theory, that stray voltage can escape from a leaky insulator, is "generally accepted in the scientific community, thus satisfying the Frye test for admissibility[.]" State v. Baity, 140 Wash.2d 1, 3, 991 P.2d 1151 (2000). We review de novo "a trial court's decision to admit or exclude novel scientific evidence under Frye [.]" Baity, 140 Wash.2d at 9, 991 P.2d 1151. This "review involves a mixed question of law and fact." Baity, 140 Wash.2d at 9, 991 P.2d 1151 (citing State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993); State v. Copeland, 130 Wash.2d 244, 255, 922 P.2d 1304 (1996)). Evidence that is admissible under Frye must still pass *537 the two-pronged test under ER 702: "[W]hether the witness qualifies as an expert, and whether the testimony would be helpful to the trier of fact." Baity, 140 Wash.2d at 10, 991 P.2d 1151. We review the trial court's decision under ER 702 for abuse of discretion. Baity, 140 Wash.2d at 9-10, 991 P.2d 1151 (citing State v. Ortiz, 119 Wash.2d 294, 308, 831 P.2d 1060 (1992)).
Under Frye, "`evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.'" Baity, 140 Wash.2d at 10, 991 P.2d 1151 (quoting State v. Martin, 101 Wash.2d 713, 719, 684 P.2d 651 (1984)). The court may look to a number of sources to determine whether it meets Frye. Baity, 140 Wash.2d at 10, 991 P.2d 1151 (citing Cauthron, 120 Wash.2d at 888, 846 P.2d 502 (examining the record, available literature, and the cases from other jurisdictions before admitting testimony about a particular type of deoxyribonucleic acid (DNA) testing)). But "evidence that does not involve new methods of proof or new scientific principles is not subject to the Frye test." Baity, 140 Wash.2d at 10, 991 P.2d 1151 (citing Ortiz, 119 Wash.2d at 310-11, 831 P.2d 1060).
At the Frye hearing, Bodman testified that a leaking insulator can cause stray voltage on a dairy farm.[8] He opined that a compromised insulator could allow current to leak across it. He stated that "the initial reason for the breakdown of the insulation characteristics or qualities is an electrical arc which results in a carbonization of contamination on that insulator. The carbon track then allows for current leakage to continue." RP Vol. II(a) at 34. If there is "arcing on at least one occasion ... we now have a compromised insulator, so we're going to have an increased risk and even a probability of current leakage" and this leakage can be continuous. RP Vol. II(a) at 34, 35. Once the leakage occurs, the electricity
[Is] going to ground [which] is why it is leaking in the first place, in this instance to the conductive materials within the cross arm and then some pathway down in the ground because of the shorter distance to the mountings on the transformer, then following the grounding conductors, from there or back into the barn on the Kaech farm because they're all interconnected.
RP Vol. II(a) at 36-37.
Bodman based his theory on established well-known theories of electricity, such as Ohm's law.[9] To support this theory, Bodman relied "upon any and all data [produced] by anyone at any time showing voltages in the animal environment to the extent they were not shown being an on-farm source." RP Vol. II(a) at 72-73; Exhibit 424(b), 93. The PUD was unable to discredit the theory proposed by Bodman.[10] Any disagreement the PUD had with Bodman's theory went to the weight of his testimony and not to his theory. Moreover, two PUD employees provided support for Bodman's theory. David Muller, the PUD's chief engineer, mentioned a possible insulator problem when he visited the farm and Rick Snelson told Kaech that the insulators could be the problem. Finally, there was evidence that the cows' behavior changed and milk production increased when the insulators were replaced.
The PUD argues that Bodman's theory is impossible because an arcing insulator will destruct. To counter this argument, Bodman testified that there was not enough heat passing through this insulator to burn it up.
Next, we consider whether Bodman qualifies as an expert to testify about such a theory, and whether this testimony would be helpful to the jury. Reese v. Stroh, 128 Wash.2d 300, 306, 907 P.2d 282 (1995) (citing State v. Russell, 125 Wash.2d 24, 69, 882 P.2d *538 747 (1994); State v. Kalakosky, 121 Wash.2d 525, 541, 852 P.2d 1064 (1993); Cauthron, 120 Wash.2d at 890, 846 P.2d 502). ER 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
The PUD maintains that Bodman lacks the credentials to testify as to a leaking insulator. We disagree. Bodman is "a professor and extension agricultural engineer working in the livestock system area in the Department of Biological System Engineering at the University of Nebraska." RP Vol. II(a) at 29. He "also run[s] a part-time consulting business" called Agricultural System Engineering. RP Vol. II(a) at 29. He has been working with stray voltage since 1975 and has published 40 to 50 articles on stray voltage. He has tested stray voltage on several hundred farms. He has written numerous articles on how to locate stray voltage on a farm. He has testified as an expert in several states, where he traced the source of the stray voltage on dairy farms.[11] Bodman has taken electricity courses over the years. He is also familiar with electrical systems and has experience working with insulators. RP Vol. II(a) at 58. The trial court did not err in allowing Bodman to testify as an expert about a leaking insulator being a possible source of stray voltage.
Bodman's testimony, to be admissible, must also be useful to the fact finder. State v. Ciskie, 110 Wash.2d 263, 271, 751 P.2d 1165 (1988). To properly explain stray voltage, the experts referred to computer test results, complicated electrical diagrams, and theories of electricity. These experts relied on their education, skills, and experience to help the jury understand the issues. Bodman's testimony about the leaking insulators was useful to the jury to determine what injured Kaech's cows. Electrical systems and stray voltage are complicated subjects beyond the typical juror's understanding. The trial court did not abuse its discretion in allowing Bodman to testify as an expert about leaking insulators.

IV. Admission of Damages Evidence
The PUD argues that the trial court should not have allowed Dr. Behr to present his economic loss calculations and should have limited economic loss evidence to the time before December 1994.
We review a trial court's evidentiary rulings for an abuse of discretion. Hendrickson v. King County, 101 Wash.App. 258, 266, 2 P.3d 1006 (2000) (citing Hizey v. Carpenter, 119 Wash.2d 251, 268, 830 P.2d 646 (1992)); In re Estate of Kessler, 95 Wash.App. 358, 382, 977 P.2d 591 (1999) ("[T]he trial court did not abuse its discretion in denying the Trimms' motion to exclude Dr. Leverenz' testimony."). "Unless the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons, this [C]ourt will uphold an evidentiary ruling." Blomster v. Nordstrom, Inc., 103 Wash.App. 252, 259, 11 P.3d 883 (2000).
A. Dr. Behr's Economic Loss Calculations
The PUD argues that Dr. Behr's calculation of loss for declining milk production violated the "New Business Rule." Br. of Resp't at 15. The new business rule precludes "an unestablished business from obtaining lost profits as damages" because "`[w]hen the business is in contemplation, but not established, profits that may be anticipated therefrom are too speculative, uncertain, and conjectural to become a basis for the recovery of damages ... for the subsequent loss of such profits.'" No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc., 71 Wash.App. 844, 849, 863 P.2d 79 (1993) (quoting Webster *539 v. Beau, 77 Wash. 444, 452, 137 P. 1013 (1914)).
The new business rule was modified in Larsen v. Walton Plywood Co., 65 Wash.2d 1, 16-17, 390 P.2d 677 (1964), to allow the recovery of lost profits "when a reasonable estimation of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantially the same market conditions." No Ka Oi, 71 Wash.App. at 849, 863 P.2d 79. "[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a `substantial and sufficient factual basis' rather than by mere `speculation and hypothetical situations.'" No Ka Oi, 71 Wash.App. at 849, 863 P.2d 79 (quoting Larsen, 65 Wash.2d at 19, 390 P.2d 677).
The PUD moved to exclude Dr. Behr's testimony. The trial court denied the motion, but limited Dr. Behr's damage calculations to November 15, 1996, the date the farm went out of business. Dr. Behr calculated loss from milk production at $704,020. The PUD argues that Dr. Behr failed to consider the age and condition of the herd, quantity and quality of feeding, milking frequency, the equipment condition, and the herd's lactation cycles.
Dr. Behr's figure was based on a variety of factors, which included a rolling herd average. This average accounts for many of the factors the PUD claims were omitted. Dr. Behr testified that:
[T]he rolling herd average is smoother than month-to-month figures. For example, many dairy herds have a fairly identifiable seasonal pattern to them where certain months of a year production per cow tends to be high and other months of the year it tends to be low, largely because a cow gives more milk shortly after she has a calf than she does several months later.
RP at 1193. Dr. Behr also tabulated the actual milk the herd produced by documenting the milk check stubs and the herd size. Using dairy herd improvement records he then compared these results against the Washington State Average Trend.[12] Dr. Behr's testimony was based on tangible evidence having a sufficient and substantial factual basis. No Ka Oi, 71 Wash.App. at 849, 863 P.2d 79.
The trial court did not abuse its discretion in allowing Dr. Behr to testify about economic losses from January 1992 to November 15, 1996.
B. Lost Milk Production After November 1994
The PUD moved to exclude lost milk damages after November 1994 because cows not subjected to stray voltage were added to the herd after that date. The PUD wanted to limit damages to 150 cows because "Kaech [was] planning on a herd of 150 cows[.]" RP at 194.
Dr. Behr calculated milk loss to November 1996 by taking the difference between the actual milk production of the herd and the probable milk production of the herd absent the stray voltage. But the calculation did not increase by including additional cows; instead, it reduced the damages because it raised the average actual milk production thus reducing the difference between the actual and probable milk production. Further, there was testimony that the herd did not recover immediately after PUD replaced the insulators. The jury was entitled to consider this in awarding damages.
In short, Dr. Behr testified to the effect of stray voltage on milk production. Damages for property loss are intended "to place the injured party in the condition in which he would have been had the wrong not occurred." Flint v. Hart, 82 Wash.App. 209, 222, 917 P.2d 590 (1996) (quoting Tilly v. Doe, 49 Wash.App. 727, 731-32, 746 P.2d 323 (1987)). The trial court did not err in allowing the testimony.

V. Admissibility of BPA Test Results
The PUD argues that the trial court erred in admitting BPA stray voltage test data as evidence because Kaech did not authenticate it. The PUD contends the jury *540 was able to assume the tests were valid, which allowed them to also assume the PUD caused the stray voltage.
Generally, a report of a test process or test results must be authenticated. State v. Roberts, 73 Wash.App. 141, 144-46, 867 P.2d 697 (1994); ER 901(b)(9). Here, the PUD moved to exclude the BPA test results because there was doubt as to the validity of the tests. The trial court denied the motion, and Kaech's attorney asked Bodman:
Q: Also, throughout that period of time there was some testing done by Bonneville Power, are you familiar with that?
A: Yes.
Q: Have you reviewed that data?
A: I have.
Q: Based on your experience, Mr. Bodmanand have you seen computer printout data, the sampling recorders before?
A: I have.
Q: Based on your review of data on its face, can you tell us whether or not it appears to be in any way inaccurate?
[Defense]: Objection, your Honor
The Court: Foundation?
[Defense]: Can we have a side bar? (Discussion held off the record at the bench)
The Court: You might rephrase your question ...?
Q: Mr. Bodman, are there times in your experience when you look at testing information when you can come to a determination that there was something obviously wrong with the testing?
A: Occasionally that occurs, yes.
Q: And so my first question I guess is, looking at the test data, can you tell us whether or not there appeared there was anything obviously wrong with testing just from looking at the information?
[Defense]: Objection, relevancy, your Honor.
The Court: I'll overrule the objection.
Witness: We're talking about BPA's data?
Q: Yes, sir.
A: There was nothing on the surface that tells me that their investigator was inexperienced or there was something wrong with the data.
RP at 202-04. Kaech would have had to authenticate the BPA test results if the PUD had made a timely authentication objection. Roberts, 73 Wash.App. at 146, 867 P.2d 697. The PUD, however, did not make such an objection. As a result, the PUD waived the authentication requirement. Roberts, 73 Wash.App. at 146, 867 P.2d 697.
Bodman did consider the BPA tests in reaching his conclusions about stray voltage on Kaech's farm. The PUD argues that this consideration allowed the jury to assume the tests were valid without proper authentication. Bodman, however, relied on other tests and factors to support his theory. Further, the PUD asked Bodman on cross if he believed the tests to be valid. Bodman replied that "[t]he [person] who conducted the test questioned whether the test data was valid." RP at 415. Additionally, the PUD had the BPA employee who conducted the tests at Kaech's farm testify that the results were unreliable. Any error in admitting the BPA tests was harmless.
Additionally, Kaech did not introduce the BPA test results. Rather, Bodman testified that the results on their face were inconclusive as to the test's reliability. Thus, authentication was not required. Kaech did not introduce the BPA test results until he testified about taking the original test results from BPA's machine on his farm and making copies of them. The PUD objected based on lack of authenticity. The trial court allowed Kaech to identify the original test results and the copies he made. It then admitted the test results into evidence.
The trial court did not abuse its discretion in not excluding the BPA test results for Kaech's failure to authenticate them during Bodman's testimony.

VI. Kaech's Appeal
Kaech argues the trial court erred in dismissing his claims based on nuisance, trespass, and misrepresentation.
*541 A. Nuisance and Trespass
Nuisance is "an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property[.]" RCW 7.48.010;.120; Tiegs v. Boise Cascade Corp., 83 Wash. App. 411, 415, 922 P.2d 115 (1996), aff'd, 135 Wash.2d 1, 954 P.2d 877 (1998). A person trespasses when he or she "intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." Bradley v. Am. Smelting & Refining Co., 104 Wash.2d 677, 681-82, 709 P.2d 782 (1985) (quoting RESTATEMENT (SECOND) OF TORTS, § 158 (1965)).
In Pepper v. J.J. Welcome Const. Co., 73 Wash.App. 523, 546, 871 P.2d 601, review denied, 124 Wash.2d 1029, 883 P.2d 326 (1994), overruled on other grounds by Phillips v. King County, 87 Wash.App. 468, 943 P.2d 306 (1997), aff'd on other grounds, 136 Wash.2d 946, 968 P.2d 871 (1998), the plaintiff alleged claims of negligence, nuisance, and trespass, but the trial court refused to submit the trespass and nuisance claims to the jury because of insufficient evidence. The court held that:
A party's characterization of the theory of recovery is not binding on the court. It is the nature of the claim that controls. `[T]hree separate legal theories based upon one set of facts, constitute one `claim for relief' under CR 54(b).' For purposes of CR 54(b), a single claim for relief, on one set of facts, is not converted into multiple claims by the assertion of various legal theories.
Pepper, 73 Wash.App. at 546, 871 P.2d 601 (citations omitted). Thus, a nuisance claim that is simply a restated negligence claim need not be considered separately from the negligence claim. Atherton Condo. Apartment-Owners Ass'n Bd. of Dir. v. Blume Dev. Co., 115 Wash.2d 506, 527, 799 P.2d 250 (1990). If the alleged nuisance is the result of the defendant's alleged negligent conduct, negligence rules apply. Atherton, 115 Wash.2d at 527-28, 799 P.2d 250 (citing Hostetler v. Ward, 41 Wash.App. 343, 360, 704 P.2d 1193 (1985); cf. Albin v. National Bank of Commerce, 60 Wash.2d 745, 753, 375 P.2d 487 (1962) (trial court properly refused to give a proposed instruction on nuisance that was based on the same omission to perform a duty that allegedly constituted negligence)).
Here, Kaech alleged that stray voltage escaped from faulty insulators and damaged his dairy herd. Thus, the same set of facts supports claims of negligence, nuisance, and trespass. Like Pepper, this is a "negligence claim with multiple theories." Pepper, 73 Wash.App. at 547, 871 P.2d 601.
Additionally, the trial court dismissed the trespass claim for insufficient evidence. To establish trespass, Kaech must show that the PUD desired the consequences of its actions, or he believed the consequences were substantially certain to result from its conduct. Seal v. Naches-Selah Irrigation Dist., 51 Wash.App. 1, 5, 751 P.2d 873 (1988) (citing Bradley, 104 Wash.2d at 682, 709 P.2d 782).
Here, Kaech argues that the PUD trespassed when stray voltage entered the farm, the PUD was made aware of it and failed to take corrective measures, and damage resulted. Kaech, however, produced no evidence that the PUD desired the consequences of its actions, or that it believed the consequences were substantially certain to result from its acts. Seal, 51 Wash.App. at 5, 751 P.2d 873. Rather, the PUD attempted, although ineffectively, to fix the problem; their actions did not amount to a trespass. The trial court did not abuse its discretion in refusing to instruct the jury on trespass.
B. Misrepresentation
Kaech claims the PUD negligently misrepresented the facts by failing to disclose stray voltage readings. Washington has adopted the RESTATEMENT (SECOND) OF TORTS, § 552 (1977), which defines negligent misrepresentation as:
One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable *542 care or competence in obtaining or communicating the information.

Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 180, 876 P.2d 435 (1994) (emphasis added).
Here, Kaech claims the PUD denied the problem and misrepresented the facts about whether the farm had stray voltage despite having test data showing otherwise. The evidence shows that the PUD did not believe Kaech had stray voltage. The PUD's tests showed that voltage was above normal in certain areas but it did not know why. Kaech knew of the testing and the PUD's confusion about the cause of the test results, but he did not detrimentally rely on the PUD's conclusions. Instead, he disconnected the farm from PUD service to run his own tests, and he asked the BPA to test for stray voltage. The evidence was insufficient to show that the PUD either intentionally or negligently misrepresented test results. The trial court did not err in dismissing the misrepresentation claims.
The judgment is reversed and the matter remanded for a new trial limited to damages.
We concur: HUNT, J. and QUINN-BRINTNALL, J.
NOTES
[1] Kaech bought first calf heifers, which have never been milked or reproduced. John testified that there could be potential problems with older lactating cows.
[2] Kaech's voltmeter tested for two volts when the power was disconnected.
[3] Stray voltage is explained as follows:

All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical `appliance.' After exiting the `appliance' that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation. Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waterers. The current simply uses the cow as a pathway in its eventual return to the substation. Apparently very slight voltages can affect cattle. Evidence [has] suggested anything greater than one volt can be catastrophic to a dairy farm.
Schlader v. Interstate Power Co., 591 N.W.2d 10, 12 (Iowa 1999) (quoting Larson v. Williams Elec. Coop., Inc., 534 N.W.2d 1, 1-2, n. 1 (N.D.1995)).
[4] These appeals were deemed premature since the trial court later ruled in the PUD's favor.
[5] The PUD brought the motion for a new trial under CR 59(a)(1), (6), (7), (8), and (9).
[6] The other elements of proximate cause and damages are not at issue. The PUD argues at length that it cannot be liable for failing to determine the leaking insulator to be the cause of the stray voltage. The PUD, however, fails to argue that it breached a duty in responding to and investigating the problem.
[7] See DR. ROBERT FICK, STRAY VOLTAGE, QUESTIONS AND ANSWERS, MICHIGAN AGRICULTURAL ELECTRIC COUNCIL, MICHIGAN STATE UNIVERSITY (2001), available at http://www.egr.msu.edu/~fick/stry-q.html.
[8] Bodman limited stray voltage as "ten volts or less." RP Vol. II(a) at 32-33.
[9] Ohm's Law: Amps = Volts/Ohms; Volts = Current X Resistance. Exhibit 119.
[10] Truman Carl Surbrook, an agricultural engineer at Michigan State University, testified for the PUD that Bodman's calculations were flawed, but on cross-examination, he admitted that leaking insulators on the primary side could cause stray voltage. RP Vol. II(a) at 130-31. Michael Frank Stringfellow, a consultant physicist and electrical engineer in atmospheric electricity, testified for the PUD but admitted "[t]here is always some current flow across an insulator, even one that comes brand new out of the box." RP Vol. II(a) at 134.
[11] See Fox v. Interstate Power Co., 521 N.W.2d 762 (Iowa Ct.App.1994); James v. Beauregard Elec. Cooperative, Inc., 736 So.2d 353 (La.Ct.App. 1999); Kuper v. Lincoln-Union Electric Co., 557 N.W.2d 748 (S.D.1996); Senn v. Buffalo Elec. Coop., 196 Wis.2d 372, 539 N.W.2d 135 (Wis.Ct. App.1995); D.S. Farms v. Northern States Power Co., 196 Wis.2d 645, 539 N.W.2d 336 (Wis.Ct. App.1995) (unpublished); Matchey v. Trempealeau Elec. Coop., 190 Wis.2d 470, 528 N.W.2d 92 (Wis.Ct.App.1994) (unpublished); Taplin Farms, Inc. v. Ryder Sales & Serv., Inc., 153 Wis.2d 397, 451 N.W.2d 804 (Wis.Ct.App.1989) (unpublished).
[12] This is the average milk production per cow in the state.